**MATSUSHITA ELECTRONICS CORP., Plaintiff,**

v.

**LORAL CORP. and Loral Fairchild Corp., Defendants.**

No. 92 Civ. 5461(BSJ).

United States District Court, S.D. New York.

Aug. 22, 1997.

Morton Amster, Hopgood, Calimafde, Kalil & Judlowe, New York City, Daniel Ebenstein, Michael J. Berger, Amster Rothstein & Ebenstein, New York City, for plaintiff.

Edward M. Spiro, Morvillo, Abramowitz, Grand, Iason & Silberberg, New York City, for defendants.

1. The suit was later transferred to the Eastern District of New York.

2. MEC was a joint venture between MEI and N.V. Philips' Gloeilampenfabriken ("Philips").

## OPINION

JONES, District Judge.

In September 1991, defendants Loral Corporation and Loral Fairchild Corporation (collectively, "Loral") brought suit in the Eastern District of Virginia (the "Eastern District Litigation")[1] against Matsushita Electronics, Inc. ("MEI") and other major electronics manufacturers for infringing upon patents owned by Loral (the "patents-in-suit"). The patents-in-suit cover certain charged coupled devices ("CCDs"), which are the semiconductor chips used as the "seeing-eye" in video cameras and facsimile machines. Plaintiff Matsushita Electronics Corporation ("MEC")[2] was not a named defendant, but sold at least some of the allegedly infringing CCDs to the named defendants.

In July 1992, while the Eastern District Litigation was still pending, MEC brought the instant action (1) seeking a declaratory judgment that it had a valid sublicense for the patents-in-suit and (2) claiming that Loral's refusal to recognize the sublicense and to discontinue the Eastern District Litigation harmed MEC's business relations with customers, as certain electronics companies had refused to purchase MEC's CCDs for fear of incurring patent infringement liability.

Judge John S. Martin, Jr. granted summary judgement from the bench in favor of MEC on its claim that it holds a valid sublicense to use the patents-in-suit. The Court of Appeals for the Federal Circuit affirmed. *See Matsushita Electronics Corp. v. Loral Corp., et al.*, 93 Civ. 1435, 1994 WL 497955 (Fed.Cir.1994).

In July 1996, this Court conducted a six-day bench trial on MEC's remaining tortious interference with business relations claim.[3] The parties gave their summations on October 7, 1996.

With respect to this claim, MEC argues that the Eastern District Litigation was a "sham" and that Loral instituted and maintained the suit not in a good faith attempt to

3. Because the parties agreed to a bifurcated trial for damages and liability, the trial concerned only liability.

enforce its patent rights, but with the bad faith intent to interfere with MEC's business relations with its customers. In this connection, MEC argues that Loral's position in the Eastern District Litigation was "objectively baseless," and that by at least February 5, 1992, Loral possessed written documentation establishing MEC's sublicense to the patents-in-suit.

Loral asserts that the Eastern District Litigation was at all times a reasonable and good faith effort to enforce its rights to the patents-in-suit. As such, Loral argues that it is immune from suit under the *Noerr–Pennington* doctrine, which shields litigants from liability for maintaining "genuine" litigation, which is litigation that is either objectively reasonable or brought in good faith (or both), and that, in any event, MEC has failed to prove the elements of its claim for tortious interference with business relations.

Having considered the volumes of trial testimony and exhibits, and the thoughtful arguments advanced by both sides, this Court finds (1) that the Eastern District Litigation was not an objectively baseless suit and (2) that Loral genuinely believed in the merits of the litigation. As such, MEC has failed to prove by a preponderance of the evidence that the Eastern District Litigation constituted the kind of "improper means" needed to establish the tort of intentional interference with business relations. Accordingly, the Court grants judgment in favor of Loral.

## FINDINGS OF FACT

The following constitutes this Court's findings of fact pursuant to Fed.R.Civ.P. 52(a).

### I. *The Patents–In–Suit*

In 1989, Loral acquired the ownership rights to the patents-in-suit from Fairchild Weston, which had acquired them from Fairchild Semiconductor, a successor company of Fairchild Camera & Instrument Company ("Fairchild").

In late 1990, Loral began investigating whether manufacturers of camcorders and fax machines were infringing the patents. Loral representatives purchased camcorders and fax machines, disassembled them, and discovered that they used CCDs covered by the patents-in-suit.

Additionally, Loral—through Loral Fairchild Corporation's General Counsel Stephen Wahl ("Wahl")—retained the law firm of Skjerven, Morrill, MacPherson, Franklin & Friel (the "Skjerven firm") to investigate primarily technical and legal issues related to the patents-in-suit. Several Skjerven firm attorneys were former Fairchild patent attorneys, including Allan MacPherson, a Skjerven partner who had been involved with Fairchild's licensing activities in the late 1970s and early 1980s. According to Wahl, MacPherson informed him that licenses were issued, but had expired.[4]

Wahl also conducted his own documentary search for possible outstanding licenses. In August 1991, he contacted John M. Clark III ("Clark"), counsel to National Semiconductor Corporation ("National Semiconductor"), which had acquired certain patents (not including the patents-in-suit) and licensing files from Fairchild Semiconductor. Clark told Wahl that (1) he was not aware of any unexpired licenses issued to Japanese companies such as MEC and (2) he would review the files to confirm that there were no such licenses. Based on this information, Wahl advised Anthony Karembelas ("Karembelas"), a Loral patent attorney, in a written memorandum that any issued licenses had expired.[5]

---

4. At trial, MEC submitted testimony and other evidence challenging Loral's good faith in initiating the lawsuit. By way of example only: (1) MacPherson testified that he did not recall one way or the other being asked questions about the existence of sublicenses; (2) there was evidence of a list in Wahl's possession that MEC claims would have led Loral to the discovery of the relevant cross-licensing agreement; and (3) the testimony demonstrated that the Skjerven firm did not devote any significant amount of time to investigating the existence of any licenses.

Nonetheless, this Court credits Wahl's testimony and does not find bad faith on the part of Loral with regard to its pre-suit investigation. Indeed, even MEI and MEC were unable to put their hands immediately on the relevant documents establishing a sublicense.

5. Although Clark did not recall providing this information to Wahl, this Court again credits Wahl's testimony as corroborated by his prior written statement. In this connection, during the summer of 1992, National Semiconductor

## II. *The Eastern District Litigation*

Based on its pre-suit investigation, Loral genuinely believed that certain companies were using CCDs that infringed on the patents-in-suit. It then hired the law firm of Wiley, Rein & Fielding ("Wiley Rein") to enforce its rights in the patents-in-suit.

One of Wiley Rein's attorneys, James Wallace, was informed that MacPherson had advised Loral that licenses to the patents-in-suit had been issued but had expired; Wallace knew MacPherson to be an experienced semiconductor lawyer. Based on these representations and others by Wahl and Karembelas, Wallace concluded that there was no deficiency in the pre-suit investigation.

Accordingly, on September 12, 1991 Loral filed the complaint initiating the Eastern District Litigation. The complaint named MEI and Matsushita Electronics Corporation of America (a wholly owned subsidiary of MEI) (collectively, the "Eastern District Matsushita defendants") and various entities that had purchased CCDs from MEC, alleging that they were manufacturing or using CCDs that infringed the patents-in-suit.[6]

On the same day it filed the complaint in the Eastern District Litigation, Loral sent letters to each of the named defendants, informing them of the case and inviting them to engage in "discussions of possible license arrangements" in order to avoid the expense of litigation.

### A. *The Eastern District Matsushita Defendants Proffer A "Sublicense"*

On September 27, 1991, MEI's Intellectual Property Center in Japan wrote to Morton Amster ("Amster") and Michael Berger ("Berger"), counsel for the Eastern District Matsushita defendants, of the possible existence of an "old, expired" letter agreement that might be relevant to the patents-in-suit. At this point, neither Amster nor Berger knew if any sublicense, in fact, existed. Amster, however, recognized that "[i]f indeed there was a license ... there could be a huge economic advantage to MEC if they could get that license confirmed quickly and then turn around and tell everyone in the industry ... that we are a license source for their CCDs"; Amster recognized that the Eastern District Litigation presented an opportunity for MEC to prove that its CCDs were licensed and thus to convince potential customers to purchase CCDs from it.[7]

Roughly one month later, Amster received documents which MEI claimed established MEC's sublicense. On October 30, 1991, Amster and Berger telephoned Loral Corporation General Counsel Michael B. Targoff ("Targoff") and told him that MEC had a sublicense from N.V. Philips Gloeilampenfabriken ("Philips") pursuant to (1) a 1969 agreement between Fairchild and Philips (the "Technical Exchange Agreement") whereby the signatories cross-licensed to each other hundreds of patents, including the patents for the patents-in-suit and (2) a letter agreement dated December 15, 1969 (the "December 15, 1969 Letter Agreement") between Philips and MEC.

By letter that same day, Amster confirmed his conversation with Targoff and elaborated on the basis for the claimed sublicense. Specifically, Amster explained: CCDs manufactured by MEC were sold to MEI and other Eastern District Litigation named defendants; MEC was a joint venture between Philips and MEI; Fairchild and Philips con-

---

produced, pursuant to a subpoena issued in January 1992, documents to Loral in connection with the Eastern District Litigation. The production included the Technical Exchange Agreement and some expired license agreements with some of the defendants in the Eastern District Litigation, but did not include the December 15, 1969 Letter Agreement, the Designation Letter or any license or sublicense agreement between Philips and MEC. The absence of these documents corroborated Wahl's recollection that Clark had told him during the pre-suit investigation that any Japanese licenses to the patents-in-suit had expired.

6. It is now undisputed that MEC, not MEI, manufactured the CCD chips that were the subject of the Eastern District Litigation through MEC. MEI purchased MEC's CCD chips.

7. Similarly, Berger testified that the litigation "presented a business opportunity for Matsushita since Matsushita would have been the only licensed source of CCDs under these two patents...."

cluded two broad cross-licensing arrangements involving semiconductor technology, including the November 1969 Technical Exchange Agreement;[8] and the December 15, 1969 Letter Agreement gave MEC a sublicense to the patents-in-suit as an affiliated company. Additionally, Amster told Targoff that Philips notified Fairchild, by letter dated April 3, 1970 (the "Designation Letter"), that it had designated MEC a Philips' affiliate pursuant to the Technical Exchange Agreement. Amster did not, however, attach to his letter any of the documents that he referenced.

Next, on November 6, 1991, Amster and Berger met with Targoff and furnished only the Technical Exchange Agreement (with the financial terms redacted) and the Designation Letter, which was not on letterhead and was undated. They directed Targoff to certain provisions in the Technical Exchange Agreement and stated their conclusion that it, along with the Designation Letter, proved that MEC had a sublicense to the patents-in-suit.

From Amster's perspective, MEC had supplied Targoff at this point with enough information to prove the existence of a sublicense to the patents-in-suit; he stated at trial that the two documents he provided were a "slam dunk" that clearly showed the sublicense. He expected Targoff to trust his November 6, 1991 representation that MEC was sublicensed to use the patents-in-suit and believed that Targoff did not necessarily need to see all of the relevant, authentic documents: "I think when lawyers who have been around this business for 35, 40 years say something on behalf of a client and their credibility is at stake that serious lawyers on the other side ought to respect that and I thought that Mr. Targoff full well understood that we would not misrepresent knowingly what we understood to be the agreement between two major companies to counsel for another company."

### B. *Loral Remains Unconvinced That MEC Has A Sublicense*

From Loral's viewpoint, the Eastern District Matsushita defendants' warranties and representations were not enough to convince it that others could legally use the patents-in-suit.

In fact, the two documents produced on November 6, 1991 bolstered Loral's belief that a sublicense never existed or had expired. First, the Designation Letter does not, alone and on its face, grant MEC a sublicense, but instead terms it an "affiliate." It reads in its entirety:

> We herewith have pleasure in designating Matsushita Electronics Corporation of Osaka as Affiliated Company owned for less than 50% and qualifying under the last sentence of Section 2 (b) of Article 1 of the Technical Exchange Agreement between our two companies dated November 1, 1969.

Second, Loral representatives found conditions in the Technical Exchange Agreement that they believed were unfulfilled, thus invalidating any claimed sublicense granted pursuant to it. Most importantly, the Technical Exchange Agreement allows Philips to grant sublicenses only to its affiliates. The agreement defines Philips' affiliates, meanwhile, as those entities in which it has no less than a 30 percent ownership interest, and over which it has either "effective" or "negative" control. According to the agreement, Philips has "negative control" over any entity that it *"in practice* [is] ... in a position capable of preventing a significant decision being made with respect to the activities or operations of such entity in contravention to the wishes of [Philips]." (Emphasis added.)

The Technical Exchange Agreement also requires Philips' to *maintain* either effective or negative control over its affiliate, providing that "in the event an entity which was ... an Affiliated Company changes so that such entity no longer falls in that category, the licenses extended to such entity and the right to receive information under this Agreement shall automatically terminate as of the date such change occurs." Moreover,

---

**8.** The other agreement was the Patent License Agreement, which was executed in November 1968 and made effective January 1, 1969. The parties agree that the Patent License Agreement does not apply to the patents-in-suit.

the agreement requires any affiliated company receiving a sublicense to "grant back" to the other party, in consideration of the sublicense, any patent licenses of the same scope as those granted to it.

In Light of these provisions (and indeed throughout the litigation), Loral remained unconvinced that Philips ever had or retained the requisite control over MEC; it genuinely suspected that any sublicense MEC claimed would be invalid.

Indeed, Wallace, who testified that he "reviewed literally thousands if not ten thousands of licenses" during his career, found the argument that these documents constituted a sublicense "to be rather bizarre." [9] He advised Targoff—albeit not in a formal legal opinion—that "if they have got a sublicense, they ought to produce it." In fact, Amster had not yet provided the December 15, 1969 Letter Agreement, which he admitted must be read in conjunction with the Technical Exchange Agreement and the Designation Letter to determine the sublicense from Philips to MEC. Additionally, Amster stated at trial that he could not certify that the copy of the Designation Letter he provided to Targoff was an authentic document.

Thus, after reviewing the documents produced on November 6, 1991, Targoff requested documentation showing that the Technical Exchange Agreement's conditions "were satisfied originally and continued to be satisfied;" he reasonably sought evidence to answer his sincerely held concerns regarding the control question.

As a result of the November 6, 1991 meeting and in order to satisfy Targoff's concerns, MEC's counsel sent a proposed settlement agreement to Targoff on November 11, 1991 that again summarily represented and warranted that the condition of control had been satisfied. Targoff and Wallace, however, believed that any settlement would have been premature; Targoff refused to accept the

Eastern District Matsushita defendants' representations before completing his own due diligence.[10]

About a week later, Targoff received the December 15, 1969 Letter Agreement (with payment amounts redacted). In reviewing the document, he noticed that it imposed yet another control condition that needed to be fulfilled in order to maintain a sublicense to the patents-in-suit. The letter stated that any sublicense granted to MEC would lapse if Philips "would control a smaller percentage of stock in [MEC] than we control now or any of our stipulations in the existing agreements and Articles of Incorporation would change to the effect that our effective control would be less than it is now." As this condition seemed to impose a condition of control that was even stricter than that of the Technical Exchange Agreement, it further heightened Targoff's suspicion that he "was barking up a path that was uncomfortable for [the Eastern District Matsushita defendants]."

On November 22, 1991, Targoff wrote to Amster informing him that "Loral ... is prepared to amicably settle our lawsuit against Matsushita provided we are sufficiently satisfied that the facts warrant it." The letter also stated that Loral required further documentation and requested unredacted versions of the Technical Exchange Agreement, the December 15, 1969 Letter Agreement, all agreements between Philips and MEC involving the relevant subject matter, and "corporate documents, minutes of meetings and committees, correspondence between Philips and MEC on such issues and any communications with any Japanese government authority with jurisdiction over Philips investment and control."

The Matsushita defendants were not eager to respond. Loral perceived this as foot dragging, which bolstered Targoff's suspicions that the fact-specific condition of control required by the documents he had

---

**9.** MEC presented no proof that the combination of documents that MEC contended created a sublicense was a typical, and therefore readily recognizable, form of sublicense agreement.

**10.** Targoff later similarly discounted the remarks of Steven Biren, a senior intellectual property attorney for a Philips' subsidiary. In April 1992,

Biren told Targoff that Philips' believed MEC had a sublicense. Targoff, however, justifiably and in good faith insisted on documentation proving that the Technical Exchange Agreement's control conditions were satisfied. Biren did not provide any such documents.

reviewed had not been met. In this connection, Berger testified that, at first, he believed much of the information requested was irrelevant to the inquiry concerning Philips' control over MEC and that Loral's requests were unreasonable. Berger admitted, however, that he decided the requests were unreasonable before reviewing Philips' files to determine how burdensome the requested production might prove to be.

## C.  *The February 5, 1992 Production*

On February 5, 1992, the Eastern District Matsushita defendants produced the following: (1) an unredacted copy of the November 1, 1969 Technical Exchange Agreement between Fairchild and Philips; (2) a copy of the 1968 Patent License Agreement between Fairchild and Philips; (3) an unredacted copy of the December 15, 1969 Letter Agreement; (4) a copy of the Designation Letter; (5) an October 11, 1973 letter from Fairchild to Philips terminating the Technical Exchange Agreement, effective October 31, 1974;[11] (6) MEC's articles of incorporation; (7) the October 21, 1967 MEC Shareholders' Agreement between Philips and MET; and (8) documents reflecting the Japanese Government's approval of Philips' application to invest in overseas capital for the years of 1965, 1976, and 1985, which confirmed Philips' stock ownership of MEC.

At this point, MEC argues, Loral had all the evidence it needed to recognize MEC's sublicense and should have moved to dismiss MEI and MEC's other customers from the Eastern District Litigation. In this connection, MEC points specifically to its articles of incorporation—which provide that any entity holding at least 30 percent of MEC's outstanding stock could convene a shareholders meeting and that all resolutions at all MEC shareholder meetings require unanimous consent—to show that Philips maintained the requisite control over it. There is no dispute that Philips held more than the requisite number of MEC's outstanding shares at all times relevant to this litigation.

Loral and Wiley Rein, however, were not satisfied that the February 5, 1992 production conclusively proved that MEC had a sublicense to the patents-in-suit; Loral believed that the documents that MEC turned over did not provide proof of Philips' control over MEC. Targoff knew that the Technical Exchange Agreement required Philips to maintain either effective or negative control over MEC. Targoff and other Loral representatives, however, sincerely believed that in order to have "negative control" over MEC, Philips had to be able to prevent MEC's ongoing action from continuing. Targoff came to this view because he believed that the absence of such power would deprive Philips of the ability to "control ... the license" and thus gut the Technical Exchange Agreement's intent to ensure that Philips maintained control over the CCD technology at issue. MEC's articles of incorporation, meanwhile, only allowed Philips to place matters on MEC's shareholder meeting agenda[12] and to veto MEC shareholder resolutions. In Targoff's view, such power gave Philips "absolutely no control" over MEC because it did not guarantee Philips' the ability to stop MEC's ongoing conduct.[13]

---

**11.** This letter terminated the Technical Exchange Agreement only with regard to patent licenses granted after October 31, 1974. The parties agree that the letter does not affect the patents-in-suit.

**12.** In this connection, MEC's articles of incorporation required the company to submit only select matters for shareholder approval.

**13.** Specifically, Targoff testified to the following:

At some point, Mr. Amster tried to satisfy my concern about—my expressed concern about the control by delivering to me the articles of incorporation, I believe. And there it had what I described to him and what were typical boilerplate type of control protections that a minority shareholder would seek, in my experience. Those were things about mergers, sale of assets, banking matters, principally.

And I said to him that I believed that the context of control in a patent license agreement required a different kind of control than simply being able to stop a merger ...

I explained to him that I believed that ... the protection Fairchild sought was the protection that Philips would have sufficient control over what was important to Fairchild, and what was important to Fairchild was the technology. So it didn't matter to Fairchild whether they sold more stock or got a loan.

What should have been important to Fairchild was that Philips, who was the party, after all, that they were making the agreement with, did

Additionally, the control conditions specified in the December 15, 1969 Letter Agreement imposed fact specific conditions that needed to be fulfilled in order for MEC to maintain its sublicense to the patents-in-suit; like the Technical Exchange Agreement, it outlined a scenario in which sublicenses, once granted, could later extinguish. Loral concluded that such a condition could not necessarily be satisfied by MEC's articles of incorporation but required information about Philips' relationship with MEC over time.

Targoff's interpretation of the control required was rejected by the District Court and the Federal Circuit—which eventually found that MEC's articles of incorporation provided the requisite negative control because they provided Philips with veto power over any of MEC's planned actions. This Court finds, however, that Loral's positions, although incorrect, were not objectively baseless and were sincerely held. Loral was entitled to test its theories in court.[14]

In April 1992, Loral sent letters to various electronics manufacturers warning them that they might be infringing the patents-in-suit by using CCDs in their products. The letter proposed that the manufacturers provide certain information "to avoid involving your

company in litigation" and suggested exploring "a license under Loral's CCD patents."

Before Loral sent these letters, it made no effort to determine whether any of the companies purchased CCDs from MEC. Some of the companies, however, were MEC's customers. Loral did not ultimately sue any of these companies. It did, however, send the letters based on its belief that no sublicense to the patents-in-suit existed.

Based on the demeanor of Loral's witnesses, the Court concludes that its litigation conduct was undertaken with the genuine belief that MEC's claim to a sublicense for use of the patents-in-suit was dubious and that Loral's claims were legally viable.

### III. *The Instant Action*

No party moved for summary judgment in the Eastern District Litigation. Rather, on July 21, 1992 MEC brought the instant action against Loral seeking a declaratory judgment that it was sublicensed under the patents-in-suit and claiming tortious interference with business relations. Loral immediately filed a series of discovery requests for information regarding Philips' relationship to MEC. MEC, meanwhile, sought leave to file a summary judgment motion on its subli-

have effective control, or some control—this document described it as effective—of what went on with the technology, with the patents they were in fact licensing. It seemed to me that Fairchild would want to prevent Philips from irresponsibly licensing someone who didn't have the capacity to treat the technology appropriately . . .
. . . it was my view that the [articles of incorporation] were not sufficient . . .
. . . the fact that somebody could stop something from happening at a board of directors meeting or a shareholders agreement was a negative control that would have no protection or impact on effective control of the license, of the patent technology . . .
. . . I believed that the fact that Philips could say no to something but couldn't say yes to something was not effective control, as far as I was concerned. For example, if Matsushita was using silver in the process of making the chips and Philips wanted to stop that, there was no way they could stop it. They had no control whatsoever over it. Sure, they could sit—they could bring it up at a shareholders meeting and they could vote no silver and MEC vote silver and silver keeps going. So I said to them they had absolutely no control, at

least from this document, that would give them the effective control that I would have wanted if I were licensing my technology . . .
. . . I thought that we needed the facts that we were asking for to determine whether I was right or they were right, and that ultimately it might need to be tested in court.

After carefully reviewing Targoff's testimony, the Court finds that he sometimes used the word "effective" in the everyday sense of the word and not as that term is used in the Technical Exchange Agreement. For instance, in the penultimate quoted paragraph above, it is clear that although he uses the word "effective," he is speaking about "negative control" as defined by the Technical Exchange Agreement. Moreover, it was clear from the totality of his testimony that he believed MEC's articles of incorporation failed to provide Philips with *any* control. Nor did Lorak ever take the position that the Technical Exchange Agreement, required both types of control.

14. Even Berger, counsel for MEC, acknowledged that he believed, based on his experience in the patent field, that the Technical Exchange Agreement's definition of an "affiliate" was an "unusual" provision.

cense claim. The District Court, however, granted only Loral's request for additional discovery.

In response to Loral's discovery requests, MEC produced documentation that raised for Loral more questions concerning Philips' control over MEC and thus the validity of MEC's sublicense. For instance, MEC provided a memorandum dated December 1982, which Loral believed lessened the control Philips had over MEC pursuant to MEC's articles of incorporation. While the memorandum stated that the rights of shareholders under MEC's articles of incorporation "shall be maintained," it also provided that:

> [d]espite the existence of a number of clauses which, superficially, may seem to impose certain restrictions on MEC's operation and its shareholders' activity, it has never been and will never be the intention of any of the parties to the Agreement to restrict under such Agreements any activities of MEC or its shareholders. In other words, any and all clauses in the Agreements which may be interpreted as unduly restricting the activities of any party, or which require prior approval of the other party on any activity should not be interpreted to impose any such restriction or require any such prior approval ... Consequently neither party should take any action ... including ... the unreasonable exercise of rights under provision of the Articles of Incorporation of MEC, which will eventually be detrimental to this mutual agreement. . . .

Additionally, MEC produced a second memorandum, dated June 1983, which reflects an agreement between MEI and Philips and which provides that the "activities of MEC, MEI, and Philips are entirely free, legally and in practice, it being understood that no existing provisions of the MEC Agreements, which, superficially, might be interpreted as being restrictive, shall be applicable." Wallace testified that in his opinion these documents removed Philips' control over MEC and thus represented "terminating event[s]" under the Technical Exchange Agreement, that is, events that automatically ended any sublicense that MEC may have received.

MEC also produced corporate minutes showing that a Philips representative failed in his attempt to place an item on a MEC shareholders' meeting agenda. Such failure gave Loral reason to suspect that Philips may not have had *in practice* negative control over MEC, and that therefore MEC may have ceased to qualify as Philips' affiliate.

Moreover, MEC produced (1) a shorter version of the December 15, 1969 Letter Agreement that omitted the entire section relating to the Technical Exchange Agreement and addressed only the 1968 Patent License Agreement and (2) a typed Japanese translation of the letter agreement. These documents caused Loral to question which letter constituted the accurate and final version and to further doubt whether the December 15, 1969 Letter Agreement granted a sublicense to the patents-in-suit. After all, this version of the letter seemed detached from the Technical Exchange Agreement.

Continuing discovery, in the fall of 1992 the parties received declarations from or deposed individuals who had negotiated the various documents at issue. These depositions suggested that MEC was refusing to indemnify its customers for infringements relating to the purchase of MEC CCDs. Additionally, however, Roger Borovoy, who negotiated the Technical Exchange Agreement and other agreements on behalf of Fairchild, stated that it was the parties' intention to grant a sublicense to MEC and that the Technical Exchange Agreement defined "affiliated company" specifically to cover MEC. Borovoy also stated that Fairchild never intended to evaluate the day-to-day management of MEC to determine whether it remained an "affiliate" within the meaning of the Technical Exchange Agreement. Despite Borovoy's statements, Targoff continued to believe that the Eastern District Matsushita defendants had failed to prove that Philips and MEC were in compliance with the Technical Exchange Agreement's control requirements. In this connection, Loral's arguments focussed on the dealings between MEC and Philips.

In February 1993, following the completion of discovery, MEC moved for summary judgment on its claim seeking a declaratory judg-

ment regarding the sublicense. Loral cross-moved for summary judgment, relying on four basic arguments. First, it argued that the December 15, 1969 Letter Agreement, by its own terms, did not grant a sublicense whose scope would include the patents-in-suit. Second, it argued that MEC failed to "grant-back" to Fairchild a sublicense of the requisite scope as required by the Technical Exchange Agreement and the December 15, 1969 Letter Agreement. Third, it contended that Philips did not maintain sufficient control over MEC as required by the Technical Exchange Agreement and the December 15, 1969 Letter Agreement. Lastly, it argued that sublicense protection did not extend to the customers of Philips' affiliates.

After considering all of the materials submitted, Judge Martin issued an oral decision granting MEC's motion and denying Loral's cross-motion. In doing so, the Court stated that the control issue is "answered by the articles of incorporation.... The only thing Philips had to do was be in a position capable of preventing a significant decision being made with respect to activities or operations of such entity in contravention to the wishes of such parties. The articles of incorporation as they have been presented to the court give Philips that power." Judge Martin also ruled that the December 15, 1969 Letter Agreement by its terms granted MEC a sublicense. This decision was the first judicial pronouncement finally determining the scope of the sublicense.

Following Judge Martin's ruling, Loral in good faith believed that it had substantial grounds to appeal the ruling. The Federal Circuit affirmed the District Court's decision, concluding that the December 15, 1969 Letter Agreement affirmatively granted a license to MEC, and that "additional documents, testimony, and a course of dealing between the licensor Fairchild, the licensee Philips, and MEC over the years corroborate th[at] conclusion." With regard to the control issue, the Circuit noted that MEC's articles of incorporation granted Philips the

right to subject any *planned action* to a shareholder's meeting, and that since any contemplated action would require unanimous shareholder consent (including Philips') Philips retained the kind of control necessary so MEC could remain an affiliate under the Technical Exchange Agreement.[15]

Loral then filed a petition for rehearing in banc. The Federal Circuit ordered a response to be filed, but eventually denied the petition. MEC then pursued its claim for tortious interference with business relations before this Court.

## CONCLUSIONS OF LAW

■ In New York, a plaintiff claiming tortious interference with current and prospective business relations must demonstrate that (1) it had business relations with a third party, (2) the defendant, knowing of those business relationships, intentionally interfered with them, (3) the defendant acted with the sole purpose of harming the plaintiff or, failing that level of malice, used dishonest, unfair, or "improper means," and (4) there was injury to the plaintiff's business relationship with the third party. *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108–09 (2d Cir. 1997); *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767 (2d Cir.1995); *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir.1994); *Keeney v. Kemper National Ins. Companies*, 960 F.Supp. 617, 628 (E.D.N.Y.1997); *Gruntal & Co., Inc. v. San Diego Bancorp.*, 94 Civ. 5366, 1996 WL 343079, at *2 (S.D.N.Y. June 21, 1996); *see also PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 269 (2d Cir.1987) (stating that tort of intentional interference with business relations requires same showing as tort of intentional interference with prospective business relations).

■ A lawsuit constitutes "improper means" if the litigant has no belief in the merit of the litigation, or having some belief in the merit, institutes or threatens to institute the litigation in bad faith, intending only

---

**15.** The Federal Circuit also found that the December 15, 1969 Letter Agreement demonstrated that MEC had subjected its patents to the "grant-back" as required by the Technical Exchange Agreement. Additionally, the Circuit found that

the Technical Exchange Agreement insured that Philips' customers were protected from infringement suits by Philips' license, and that "by Philips' grant of a license of equal scope to MEC, MEC customers are similarly protected."

to harass third parties and not to bring the claim to adjudication. *Hubbell Inc. v. Pass & Seymour, Inc.*, 883 F.Supp. 955, 963 (S.D.N.Y.1995) (citing *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (Ct.App. 1980)); *Universal City Studios v. Nintendo Co., Ltd.*, 797 F.2d 70, 75 (2d Cir.1986) (citing Restatement (Second) of Torts) *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986).[16]

■ Regardless of whether a lawsuit constitutes "improper means," parties who maintain civil suits are entitled to immunity for doing so under the *Noerr–Pennington* doctrine of immunity so long as the litigation is not a "sham." [17] *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60–61, 113 S.Ct. 1920, 1928–29, 123 L.Ed.2d 611 (1993) (Thomas, J.); *Hirschfeld v. Spanakos*, 104 F.3d 16, 18 (2d Cir.1997).

Litigation is a "sham" if it satisfies a two-part test:

> First, a lawsuit must be objectively baseless so that no reasonable litigant could reasonably expect success on the merits. If an objective litigant could conclude that a lawsuit is reasonably calculated to obtain a favorable outcome, the suit is immunized under Noerr, and ... [a] claim premised

on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process. . . .

*Columbia Pictures,* 508 U.S. at 60–61, 113 S.Ct. at 1928.

Thus, a determination that a lawsuit was a sham involves both a finding that the challenged litigation was objectively baseless and an inquiry into the litigant's subjective motive. *Id.* at 60–61, 113 S.Ct. at 1928–29. Sham litigation is litigation that is both (1) objectively baseless and (2) not "sincerely and honestly felt or experienced," *i.e.,* brought in bad faith. *Id.* at 61, 113 S.Ct. at 1929.

### I. *Litigation Not Objectively Baseless*

■ In this case, Judge Martin granted summary judgment to MEC, finding that MEC had a valid sublicense to the patents Loral had accused it of infringing in the Eastern District Litigation. The Federal Circuit affirmed.

---

**16.** MEC suggested in its Trial Memorandum of Law and in its opening statement that a civil suit constitutes "improper means" if it is an "objectively unreasonable lawsuit." This is incorrect. As explained *supra*, a lawsuit constitutes "improper means" only if brought in bad faith. *Universal City Studios v. Nintendo Co., Ltd.*, 797 F.2d 70, 75 (2d Cir.1986) (citing *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980) and the Restatement (Second) of Torts), *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986); *United States Media Corp., Inc. v. Edde Entertainment, Inc.*, 94 Civ. 4849, 1996 WL 520901, at *12 n. 7 (S.D.N.Y. Sept.12, 1996) ("wrongful means include ... unwarranted litigation"); *The Herrick Co., Inc. v. Vetta Sports, Inc.*, 94 Civ. 0905, 1996 WL 434571, at *4 (S.D.N.Y. Aug.2, 1996) (claim asserted in good faith is not wrongful means); *Coan v. Estate of Harry Chapin*, 156 A.D.2d 318, 549 N.Y.S.2d 16, 17 (1989) ("Defendant's liability to plaintiff depends on whether defendant's threats of litigation were based upon good faith and probable cause.") Regardless, as stated *infra*, the Court

finds both that the Eastern District Litigation was not an "objectively unreasonable lawsuit" and that it was brought and maintained in good faith.

**17.** This doctrine emanates from the Supreme Court cases *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Originally, the doctrine developed to allow business interests to combine and lobby various governmental branches or agencies without worry of violating the antitrust laws. *See Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 297–99 (6th Cir.1992), *cert. denied,* 508 U.S. 957, 113 S.Ct. 2459, 124 L.Ed.2d 674 (1993). The doctrine has expanded to provide immunity from liability for bringing suit in contexts other than the antitrust arena. *See, e.g., Hirschfeld v. Spanakos*, 104 F.3d 16, 18 (2d Cir.1997) (section 1983 case). The parties agree that this case provides such a context, although they disagree as to whether the elements of the doctrine have been met.

These decisions, MEC argues, are "devastating to Loral's claim that it acted reasonably and in good faith." Conceding that "a summary judgment decision is not ordinarily dispositive on the issue of objective reasonableness," MEC contends nonetheless that the courts' decisions here determined "that no reasonable person could dispute the facts establishing the MEC sublicense." Therefore, MEC reasons, no reasonable person could have expected Loral's patent infringement suit to succeed.

This Court disagrees. The Supreme Court warns lower courts "to resist the understandable temptation to engage in *post hoc* reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation." *Columbia Pictures,* 508 U.S. at 61 n. 5, 113 S.Ct. at 1928 n. 5 (quotation omitted)

Simply put, the granting of summary judgment signifies a finding that no reasonable *juror* could find by a preponderance of the evidence for the losing party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Resolution of the objective prong under the *Noerr–Pennington* doctrine, meanwhile, involves an inquiry into whether a reasonable *litigant* could reasonably expect success on the merits. *Columbia Pictures,* 508 U.S. at 60–61, 113 S.Ct. at 1928–29. In this case, the "reasonable juror" and the "reasonable litigant" were not twins. In fact, Loral's arguments in the Eastern District Litigation, while not winners, were not objectively baseless. The reasonable litigant could have perceived some likelihood of suc-

cess in advancing Loral's arguments concerning the sublicense for several reasons.[18]

First, the Court finds that Loral had probable cause to *institute* the suit. *See THK America, Inc. v. NSK, Ltd.,* 157 F.R.D. 660, 663 (N.D.Ill.1994) ("Probable cause to institute [a] patent infringement suit requires no more than a *reasonable* belief on the part of [the patent owner] that there is a chance that its claims may be held valid upon adjudication.") (emphasis added).[19] The evidence at the time of filing would lead any reasonable litigant to expect some chance of success; in fact, Loral determined that various camcorders and fax machines used technology covered by the patents-in-suit and investigated the existence of possible licenses to use that technology.

Second, Loral grappled throughout the litigation (and in this case)—before and after the February 5, 1992 production of document—with complex issues leaving room for objectively reasonable arguments regarding the validity of MEC's sublicense. The evidence showed that MEC's sublicenses were created through an atypical arrangement that imposed unusual conditions on Philips and MEC. In this connection, MEC produced multiple copies of certain documents, some of which were undated or omitted key information. This production objectively would have piqued any reasonable litigant's curiosity concerning the authenticity of the documents.

Moreover, the reasonable litigant could have perceived some likelihood of success in forwarding Loral's argument about Philips' control over MEC. The Technology Exchange Agreement and the December 15, 1969 Letter Agreement both required Philips

---

**18.** The decisions of both Judge Martin and the Federal Circuit seem to counsel this conclusion. Judge Martin ordered discovery on the sublicense issue to continue, preventing MEC from filing a summary judgment motion at a time when it believed it had provided enough discovery to convince Loral that MEC had a sublicense. Moreover, when he ruled on the summary judgment motion, he noted that his decision was just a "way station" to an inevitable appeal. The Federal Circuit, meanwhile, never states that Loral's arguments were frivolous or unreasonable. *See Pillay v. Immigration and Naturalization Service,* 45 F.3d 14, 15 (2d Cir.1995) (finding that appeals court has inherent authority to dismiss an appeal as frivolous). Rather, it directed MEC to file a response to Loral's petition for a rehearing, suggesting that the Court did not find

the petition (and thus the underlying arguments) meritless, *cf.* Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure,* § 3986, at p. 471 (1977) (stating that appellate court should order party to answer a petition for a rehearing if "the court finds any possible merit in the petition"). In this connection, the Federal Circuit treated each argument individually, carefully delineating its decision.

**19.** *See also Scioto Cty. Regional Water District v. Scioto Water, Inc.,* 916 F.Supp. 692, 700 (S.D.Ohio 1995) (finding probable cause to bring lawsuit); *In re American Continental Corp./Lincoln Savings & Loan Secs. Litig.,* 845 F.Supp. 1377, 1385 (D.Ariz.1993) (same).

to maintain a certain level of control over MEC. It was reasonable for Loral (1) to conclude that the Technical Exchange Agreement's control provisions required Philips to be able to stop MEC's *ongoing* action and (2) to contend that MEC's articles of incorporation therefore did not provide Philips with the requisite power over MEC. The language of the Technical Exchange Agreement left room for this interpretation.

Additionally, the evidence showed that Philips tried but failed to place an item on an MEC shareholders' meeting agenda, reflecting an inability "in practice" to prevent such planned actions. Similarly, a reasonable litigant may have concluded that the memoranda produced following the February 5, 1992 production demonstrated that Philips may have lost a measure of control over MEC.

Accordingly, the Court finds that any reasonable litigant in Loral's position could have perceived some likelihood of success in advancing Loral's arguments concerning the sublicense.[20] Thus, Loral was entitled to press its claims concerning the sublicenses to the patents-in-suit in a court of law.

## II. *Loral Instituted and Maintained Litigation in Good Faith*

This Court recognizes that its conclusion that the arguments pressed in this case and the Eastern District Litigation were not objectively baseless ends the inquiry under *Columbia Pictures* and accords Loral *Noerr–Pennington* immunity. Nonetheless, given the fact that this Court had the opportunity at trial to assess the credibility and demeanor of Loral's principals and lawyers, it seems sensible to make findings regarding Loral's subjective intent. *See Computer Assocs. International v. American Fundware*, 831 F.Supp. 1516, 1525 (D.Colo.1993) (finding failure to prove objective *and* subjective elements under *Noerr–Pennington* analysis)

■ Whatever weight one gives to Loral's arguments in the Eastern District Litigation, based on the witnesses' demeanor this Court concludes that Loral brought and maintained the Eastern District Litigation (and defended this case) in good faith. In this connection, the Court finds that Loral genuinely and honestly believed that its lawsuit was legally viable.[21] The facts simply do not support any finding that the suit was an attempt to interfere with MEC's business relations through the use of the governmental process, as opposed to the outcome of that process.[22]

It is clear that Loral *believed* it had probable cause to file the suit, doing so only after

**20.** The Court's finding that these arguments were not objectively baseless is enough to cloak Loral in *Noerr–Pennington* immunity. Thus, the Court does not reach whether the other arguments advanced in this case and the Eastern District Litigation—such as, for example, whether the December 15, 1969 Letter Agreement actually granted MEC a sublicense or whether the Technical Exchange Agreement's "grant-back" provision was satisfied—were objectively baseless. The Court notes, however, that (1) in making these arguments Loral in good faith relied on the advice of its lawyers and (2) the arguments were treated seriously by the prior courts involved in this case.

**21.** This finding obviates the need to address Loral's advice of counsel defense; Targoff and other Loral representatives arrived at their conclusions on their own, i.e., they independently came to believe that MEC had failed to prove the existence of a sublicense to use the patents-in-suit. Indeed, there was evidence that Targoff, himself, wrote first drafts of letters relevant to the litigation. Nonetheless, the Court notes that the evidence showed that Loral disclosed all the relevant facts within its knowledge to Wiley Rein. Similarly, Wiley Rein acted properly and provid-

ed objectively reasonable advice, although Loral did not ultimately prevail. Loral's failure to call Bryan Earl, a former Wiley Rein associate who worked on this matter, does not alter this conclusion; the Court finds that Earl—a first-year associate at the time—did no more than summarize documents and identify potential arguments. Moreover, the Court concludes that Loral reasonably and in good faith relied on Wiley Rein's advice. In fact, Loral pressed the very arguments that Wiley Rein suggested. *See Leberman v. John Blair & Company*, 880 F.2d 1555, 1559 (2d Cir.1989) (finding no reason to question plaintiff's "good faith in soliciting [his attorney's] advice"); *Securities and Exchange Commission v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1101 (2d Cir.1972) (stating that a party asserting the good faith defense must demonstrate that its reliance was accompanied by a full disclosure of all relevant facts of the advice required).

**22.** The Court notes that although MEC now contends that Loral acted in bad faith, no party ever moved for sanctions during the course of the litigation.

(1) taking apart fax machines and camcorders, (2) discovering that some of the named defendants were using CCDs that incorporated the technology protected by the patents-in-suit, (3) searching for licenses to the patents-in-suit,[23] and (4) making a preliminary determination that no such licenses existed. Thus, Loral instituted the lawsuit after demonstrating a concern for its merits and not for an improper or malicious purpose; the filing stemmed from a good faith belief that the named defendants were infringing upon Loral's patent rights.[24]

Once Loral began receiving information suggesting MEC was licensed to use the patents-in-suit, it reviewed the data not with a wilful blindness toward recognizing the license, but with an eye towards ensuring that the license was valid. In this connection, Loral was never shown a single document claiming to be a license, but was faced with the task of piecing together a license from multiple documents presented over time.

Ever after the February 5, 1992 production of documents, Loral in good faith interpreted the documents in a manner it believed gave the company reason to suspect MEC was infringing its patents. For instance, Loral was correct in asserting that MEC's sublicense was contingent on its ability to prove Philips maintained control over the company. While its contention that the contingency was not satisfied did not ultimately prevail, Loral did not make the argument in

bad faith. Indeed, Targoff and others, under strenuous cross-examination, showed that they honestly believed that the relevant control provisions required Philips to have the power to stop ongoing behavior and not just the veto power accorded by MEC's articles of incorporation.[25]

The actions of MEC and Eastern District Matsushita defendants heightened Loral's suspicions regarding the viability of MEC's arguments. In this connection, the Eastern District Matsushita defendants resisted providing formal discovery on the sublicense issue, insisting that Loral rely on then-undocumented warranties.[26] Likewise, the fact that Amster and Berger did not immediately provide those documents produced on February 5, 1992 (the documents MEC now says established its right to the sublicense), combined with the fact that the Eastern District Matsushita defendants did not immediately move for summary judgment following that production, bolstered Loral's belief in the merits of its case. Loral was not required to accept MEC's representations, warranties, or legal interpretations.

In short, the Court finds that Loral sincerely and honestly believed in the merits of the Eastern District Litigation and maintained the lawsuit in order to protect its rights to the patents-in-suit; it did not have the "bad faith" required to defeat *Noerr–Pennington* immunity.[27] Accordingly, Loral

---

**23.** While Loral's pre-suit investigation was not all inclusive, it did not have a duty to scour the world in search of licenses. *See White v. General Motors Corp.*, 908 F.2d 675, 682 (10th Cir.1990) (stating that a reasonable attorney should investigate "obvious affirmative defenses" before filing suit), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991).

**24.** In this regard, this case differs substantially from *Universal City Studios, Inc. v. Nintendo Co.*, 615 F.Supp. 838 (S.D.N.Y.1985), *op. clarified*, 726 F.Supp. 928 (S.D.N.Y.1985), *aff'd*, 797 F.2d 70 (2d Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986), in which the evidence demonstrated that the plaintiff knew before it filed suit that its claim was unenforceable.

**25.** Similarly, it was clear from the testimony and the witnesses' demeanor that Loral pressed its other arguments regarding MEC's sublicenses in good faith as well. *See infra* n. 20.

**26.** MEC characterizes a series of letters from Wiley Rein attorney John Wyss to the Magistrate Judge supervising discovery in the Eastern District Litigation as evidence of Loral's bad faith. Those letters stated Loral's position that it had yet to be provided with a sublicense. This Court finds that the letters merely articulated Loral's sincerely held belief that the documents then-produced did not constitute a sublicense. In this connection, the Court notes that the Eastern District Matsushita defendants never moved for sanctions before the Magistrate Judge. Moreover, as stated, to Loral, the Eastern District Matsushita defendants' resistance to providing further discovery supported this belief.

**27.** *See Computer Assocs. International*, 831 F.Supp. at 1525 (finding "intent to benefit from a favorable result of litigation" irrelevant to subjective inquiry under *Noerr–Pennington*); *cf. Hirschfeld*, 104 F.3d at 19–20 (where act of pressing motion constitutes sanctionable conduct and thus is undertaken in "bad faith" under *Noerr–Pennington*).

is entitled to protection from liability in this lawsuit.

### III. Noerr–Pennington, Immunity for Non–Judicial Acts

■ MEC claims that even if Loral is entitled to *Noerr–Pennington* immunity for the Eastern District Litigation, it is not shielded from liability for non-judicial acts such as sending letters that threaten litigation. The Court concludes, however, that acts incidental to protected litigation—acts that are "reasonably and normally attendant upon protected litigation," such as sending letters threatening court action—are entitled to immunity to the same extent as the related litigation. *Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir.1983;) ("[I]t would be absurd to hold that [the doctrine of immunity] does not protect those acts reasonably and normally attendant. upon effective litigation. The litigator should not be protected only when he strikes without warning.").[28]

■ Here, Loral sent letters to defendants in the Eastern District Litigation on the same day that it filed its complaint, attaching to each letter a copy of the complaint in that action. The letter asked its recipient to engage in "discussions of possible license arrangements" and encouraged settling the underlying litigation. These letters were not only attendant to litigation that was not frivolous or baseless, but also represented a reasonable attempt to expedite the resolution of that litigation. Loral, therefore, is immune from liability stemming from this round of letters.

Loral is also entitled to immunity from tort liability stemming from the second round of letters it sent. In April 1992, Loral sent letters to companies not named in the East-

ern District Litigation, but that were using CCDs. Although Loral made no effort prior to sending the letters to determine whether those companies were customers of MEC, the letters reflect Loral's reasonable attempt to determine whether it should join those companies as defendants in the Eastern District Litigation; the fact that Loral did not ultimately bring suit against them is irrelevant. Thus, the letters are "reasonably attendant upon effective litigation" that itself was not sham litigation.

### IV. MEC Has Failed to Prove that Loral Intentionally Interfered with Its Business Relations

Just as the Court has found that the Eastern District Litigation was not a "sham," it concludes that MEC has failed to prove that Loral tortiously interfered with its business relations. Specifically, MEC has failed to show that Loral acted with the sole purpose of harming the plaintiff or that the litigation constituted "improper means." In this regard, MEC failed to demonstrate that Loral had the specific motive to harm MEC, let alone that Loral intentionally did so. The evidence at trial showed instead that Loral acted to enforce its patent rights by maintaining an objectively reasonable lawsuit in whose merits it sincerely believed. *See PPX Enterprises*, 818 F.2d at 269 ("If the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail. . . .").

### CONCLUSION

For the foregoing reasons, judgment shall be entered in favor of defendants.

So ordered.

---

**28.** *Accord West Professional Education Group v. Harcourt Brace Legal and Professional Publications, Inc.*, No. 3–95–176, 1995 WL 422651 (D.Minn. June 2, 1995); *Johnson v. Con–Vey/Keystone, Inc.*, 856 F.Supp. 1443 (D.Or.1994); *Barq's Inc. v. Barq's Beverages, Inc.*, 677 F.Supp. 449 (E.D.La.1987); *Aircapital Cablevision, Inc. v. Starlink Communications Group, Inc.*, 634 F.Supp. 316 (D.Kan.1986). *But see Laitram Machinery, Inc. v. Carnitech A/S*, 901 F.Supp.. 1155 (E.D.La.1995) ("The *Noerr–Pennington* doctrine does not extend to sending letters to a competitor's customers alleging violation of trade secrets and infringement of patents"). In declining to follow *Laitram Machinery*, the Court notes that that court cited no authority for its conclusion and failed to cite *Barq's Inc. v. Barq's Beverages, Inc.*, 677 F.Supp. 449 (E.D.La.1987), which was decided seven years earlier by the same district court and which concluded that immunity extended to letters incidental to litigation.