**BARQ'S INC.**

v.

**BARQ'S BEVERAGES, INC. and Barq's Beverages of Baton Rouge, Inc.**

Civ. A. No. 79–114.

United States District Court, E.D. Louisiana.

Dec. 4, 1987.

Phillip A. Wittman, T.A., Paul L. Zimmering, Stone, Pigman, Walther, Wittman & Hutchinson, New Orleans, La., William Lee Guice, III, Rushing & Guice, Biloxi, Miss., and George T. Mobille, Robert W. Adams, Cushman, Darby & Cushman, Washington, D.C., for plaintiff.

Donald R. Mintz, T.A., Leopold Z. Sher, McGlinchey, Stafford, Mintz & Hoffman, New Orleans, La., and William David Kiesel, T.A., Michael A. Patterson, Roy, Kiesel, Patterson & Abadie, Baton Rouge, La., for defendants.

WICKER, District Judge.

This matter was submitted to the Court on a former date. After considering the record, the exhibits, the briefs and arguments of counsel and the applicable law, motion of plaintiff and defendant in counterclaim, Barq's Inc., for summary judgment dismissing defendants' antitrust defenses and Count II of their counterclaim is granted for the following reasons:

Barq's Inc., a Mississippi corporation, (hereinafter Barq's Biloxi) a manufacturer and seller of soft drinks which does business among the several states except in Louisiana, filed a trademark infringement suit against Barq's Beverages, Inc. (hereinafter Barq's New Orleans) and Barq's Beverages of Baton Rouge (hereinafter Barq's Baton Rouge) also manufacturers and sellers of soft drinks (jointly referred to as Barq's Louisiana) who do business only in a limited area within the State of Louisiana.

Defendants included in their answer and in Count II of their counterclaim an antitrust defense. The antitrust contentions as well as damages were severed and trial proceeded without these issues. At the conclusion of the trial, this Court, sitting without a jury, found that although Barq's, Biloxi was the owner of the trademarks at issue, defendants were not franchisees or licensees but concurrent owners and no infringement occurred. These findings were predicated on the interpretation of a 1934 document in which Edward Barq, Sr., plaintiff's predecessor sold his trademark to defendants' predecessor (Jesse Robinson) to be used exclusively in a limited geographical area within the State of Louisiana. The Court also found that Mr. Barq's heirs had abandoned their right in defendants' territory to demand uniformity of product. (See Record Document No. 300 Vol. XIV). This decision was affirmed in an unpublished opinion. (Record Document No. 318, Vol. XIV.

Barq's Louisiana also advanced a defense that Barq's Biloxi had procured the trademarks by fraud. No evidence of fraud was introduced at trial and the Court found that defendants had failed to carry their burden on that issue. Therefore, the only remaining issue before the Court is whether or not plaintiff has monopolized or attempted to monopolize the soft drink industry.

Section 2 of the Sherman Act prohibits any person from monopolizing or attempting to monopolize any part of the trade or commerce among the several states. 15 U.S.C. § 2. Monopoly power is "the power to control prices or exclude competition." *U.S. v. E.I. duPont deNemours and Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956).

Summary judgment is appropriate if when the record is viewed in the light most favorable to the party opposing the motion, *Poller v. Columbia Broadcasting System, Inc., et al,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." F.R.C.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Barq's Louisiana contend that Barq's Biloxi have embarked on a plan to unlawfully monopolize the soft drink industry by writing threatening letters and filing "sham" trademark infringement lawsuits against them. Specifically, they contend that Barq's Biloxi knew from the 1934 contract that it was precluded from enforcing any

trademark rights against defendants in Louisiana. Thus its sole purpose in filing these suits was to "harass" and to eliminate defendants from the marketplace.

The evidence reflects that initially a trademark infringement suit was filed in Mississippi but dismissed by the Mississippi Court for lack of personal jurisdiction over defendants. Thereafter this suit was filed. These are the only known lawsuits filed by Barq's Biloxi against Barq's Louisiana.

The evidence also reflects that prior to initiating the Mississippi lawsuit and shortly after the Barq heirs sold their rights to Barq's Biloxi, plaintiff wrote two letters to Barq's Louisiana demanding that they as franchisees conform to the trade dress and soft drink formulas used by Barq's Biloxi. Barq's Louisiana ignored these letters and suit followed.

Barq's Biloxi has predicated its motion on the grounds that neither litigation nor threats of litigation violate the antitrust laws.

The law recognizes a jurisprudential immunity from antitrust liability. This immunity, known as the Noerr–Pennington Doctrine, evolved from two U.S. Supreme Court cases, i.e. *Eastern Railroad Presidents Conference v. Noerr Motor Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

In *Noerr*, it was alleged that antitrust violations occurred when the railroads launched an intensive but misleading publicity campaign to pass legislation unfavorable to truckers, to injure the truckers' reputation and customer relations and to persuade the governor to veto the pro-trucker bill. In *Pennington*, a large coal operation allegedly conspired to drive small coal operators out of business by trying to persuade the Secretary of Labor to set a higher minimum wage for companies selling coal to the T.V.A. These courts found that company efforts to influence the legislative and executive branches of government in order to gain a competitive edge in the marketplace did not violate the antitrust laws, both from the standpoint of not being prohibited conduct under the Sherman Act and because of the constitutional right to petition the government to redress grievances. Therefore petitioning immunity reflects not only First Amendment concerns but also a limitation on the scope of the Sherman Act. *Coastal States Marketing Inc. v. Hunt*, 694 F.2d 1358, 1364 (5th Cir.1983). Under the Noerr–Pennington doctrine, bona fide efforts to obtain or influence legislative, executive, judicial or administrative actions are immune from antitrust liability. However, the immunity does not extend to "sham proceedings," which are instituted without probable cause and in complete disregard of the law to merely cover up what is nothing more than an attempt to interfere with the business relationship of a competitor. *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533. *Accord California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corporation*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Coastal State Marketing Inc. v. Hunt, supra; Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau Inc.*, 690 F.2d 1240 (9th Cir.1982), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983).

The Fifth Circuit in *Coastal States Marketing*, 694 F.2d at 1368–1372, discussed the sham exception at great length. It stated that no sham exception could be found if the alleged offending conduct was motivated in part by a genuine desire for judicial relief. The court stated at 694 F.2d 1371:

The Supreme Court has never defined with precision the standard for determining when litigation is a sham. The usual litigant will base its decision to sue on a number of factors. Some of these considerations may be anticompetitive. Others may involve genuine desire for judicial relief or a desire to induce a better settlement than can be obtained without such leverage. The "sham" standard must account for the existence of multiple motivations.

and at 694 F.2d 1372:

Recent lower court decisions also support the conclusion that anticompetitive mo-

tives do not taint a suit filed, at least in part, in hope of judicial relief. In *Alexander v. National Farmers Organization*, 687 F.2d 1173, 1200 (8th Cir.1982), for example, the Court considered litigation that was filed for anticompetitive purposes. Among other things, the court found that the plaintiffs hoped that the costs of the suit would "break" their competitors "back." Because there was also a genuine legal dispute, however, the litigation was protected. *Id.*

The *Coastal* court went on to conclude that although a litigant may have mixed motives in bringing suit (i.e. anticompetitive motivation as well as good faith in seeking protection of the Courts) as long as a genuine desire for judicial relief is a substantial factor underlying the suit, a litigant should have petitioning immunity from the antitrust laws. 694 F.2d 1372.

■ Notwithstanding that the parties to this lawsuit are not competitors since they operate in separate geographical areas, the facts of this case place Barq's Biloxi within the petitioning immunity doctrine. Serious issues existed at trial as to whether or not the Louisiana branch of Barqs was a franchisee, a licensee, or co-owner of the marks. The contract between Jesse Robinson and Edward Barq, Sr. was ambiguous. The 1934 Agreement referred to the transaction as a sale, a franchise and a license. Extrinsic evidence was offered through the testimony of Judge McBride, the notary who passed the act of sale. He testified that the intent of Mr. Barq, Sr. was to turn over complete ownership and use of his trademarks to Jesse Robinson in a limited geographical area.

The owner of a trademark has the duty to exercise supervision and control over the use of its mark by others and over the quality of the product to which the mark applies. The purpose of such a requirement is to protect the public from deception. At the time this suit was filed, the products carrying the trademarks at issue had discernible taste differences depending on whether the product was purchased in Louisiana or outside of Louisiana. It only seems logical to this Court that once plain-tiffs purchased the trademarks and the operations of Barq's Biloxi from the heirs of Edward Barq, Sr., they would want the product being manufactured and sold in Louisiana to taste the same as it did in twenty-three other states. Had this suit been brought by plaintiff's predecessor when the Robinson family first changed the formula, the outcome of the infringement action might have been different. Although Mr. Barq, Sr. sold to Jesse Robinson and his heirs the use of the marks, he did not sell to Robinson or his heirs the right to unilaterally change the formulas. On the contrary, the contract expressly prohibited such action. The contentions of Barq's Louisiana that Barq's Biloxi knew from the 1934 contract that it was precluded from enforcing any trademark rights against defendants in Louisiana is frivolous. The only reason this Court did not find a breach of the 1934 agreement was because the Court found that the Barq heirs had abandoned the marks in defendants' territory. They could have enforced quality control but it was the complete lack of interest and "hands off" attitude by the heirs of Edward Barq, Sr. that led this Court to find abandonment of the mark. Accordingly, this Court finds that substantially all of Barq's Biloxi's actions in filing suit were genuine good faith efforts to convince the Court that an infringement had occurred.

This is not a case where Barq's Biloxi abused the judicial process by bringing suit for purely anti-competitive reasons. *Forro Precision, Inc. v. IBM*, 673 F.2d 1045, 1060–61 (9th Cir.1982). This is not a case where Barq's Biloxi's lawsuit was "nothing more" than an attempt to interfere with the business relationship of a competitor. *Hydro–Tech Corp. v. Sundstrand Corp.*, 673 F.2d 1171, 1175 (10th Cir.1982). Barq's Biloxi did not bring suit "solely to harass and hinder a competitor," *Landmarks Holding Corp. v. Bermant*, 664 F.2d 891, 896–97 (2nd Cir.1981); nor did Barq's Biloxi file repetitive lawsuits based on insubstantial claims. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359, *rehearing denied* 411 U.S.

910, 93 S.Ct. 1523, 36 L.Ed.2d 201 (1973), *on remand* 360 F.Supp. 451 (D.Minn.1973).

Utilization of the courts in a manner which is in accordance with the spirit of the law is exempt from the antitrust laws. *Edward B. Marks Music Corp. v. Colorado Mag. Inc.*, 497 F.2d 285 (10th Cir.1974) *cert. denied* 419 U.S. 1120, 95 S.Ct. 801, 42 L.Ed. 2d 819 (1975). *Accord Columbia Pictures Industries, Inc. v. Redd Horne, Inc.*, 749 F.2d 154 (3rd Cir.1984); *Coca Cola Co. v. Overland Inc.*, 692 F.2d 1250 (9th Cir. 1982); *Alberto Culver Company v. Andrea Dumon, Inc.*, 466 F.2d 705 (7th Cir. 1972).

Since plaintiff's desire for judicial relief was a significant, motivating factor underlying the initiation of this lawsuit, Barq's Biloxi is protected by the Noerr–Pennington immunity doctrine.

■ The Court also finds no merit to Barq's Louisiana's contentions that Barq's Biloxi attempted to monopolize the root beer industry by eliminating them as competitors by (a) writing threatening letters, (b) by attempting to influence bottle cap suppliers not to do business with defendants and (c) by listing its name in the New Orleans telephone directory.

In *Coastal State Marketing*, threatened litigation and attending publicity were seen as part and parcel of the petitioning immunity of Noerr Pennington if the litigation itself was in good faith. Specifically, as to whether the Noerr–Pennington immunity covered "threats of litigation," the *Coastal* court stated at 694 F.2d 1367:

> Given that petitioning immunity protects joint litigation, it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation.... If litigation is in good faith, a token of that sincerity is a warning that it will be commenced....

*Coastal* distinguished *Alexander v. National Farmers Org.* 687 F.2d 1173, 1200 (8th Cir.1982), which found that threats of litigation were unprotected. The litigation itself in *Alexander* was found to be a sham and therefore differed from actions taken in good faith. *Coastal*, 694 F.2d at 1367, n. 30.

Here the litigation was initiated in good faith. Therefore plaintiff's actions (including letters to suppliers and demand letters) which preceded the filing of this lawsuit are also protected under the Noerr–Pennington petitioning immunity.

The Court also finds that Barq's Biloxi did not violate the antitrust laws by listing its name in the New Orleans telephone directory. The antitrust laws are designed to protect "competition, not competitors." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

To prove the offense of monopoly under § 2 of the Sherman Act, Barq's Louisiana would have to prove that Barq's Biloxi had (1) possession of monopoly power in the relevant market and (2) that the maintenance of this power is not the "consequence of a superior product, business acumen, or historic accident." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487 (5th Cir.1984), quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *Sulmeyer v. Coca–Cola Company*, 515 F.2d 835 (5th Cir.1975). Seemingly, telephone listings would come under the category of "business acumen" so that even if some business was diverted from Barq's Louisiana by the listing of Barq's Biloxi in the telephone directory, it would not be such as to violate § 2 of the Sherman Act.

■ In addition, this Court finds that Barq's Biloxi does not possess sufficient market power to violate Sherman § 2. "[The] power that ... soft drink manufacturers have over their trademarked products, is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product." *Dupont*, 351 U.S. at 393, 76 S.Ct. at 1006. "Because relevant market provides the framework against which economic power can be measured, defining the product and geographic markets is a threshold requirement under § 2." *Spec-*

*trofuge Corporation v. Beckman Instruments, Inc.,* 575 F.2d 256, 276 (5th Cir.) *rehearing denied,* 582 F.2d 41 (5th Cir. 1978) *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

Defining the relevant market is also important in attempted monopolization cases under § 2 of the Sherman Act because "[t]he offense of attempted monopolization requires both specific intent to accomplish the illegal result (acquisition of monopoly power in the relevant market) and a dangerous probability of success in that endeavor." *Sulmeyer,* 515 F.2d at 851. *See Cliff Food Stores, Inc. v. Kroger, Inc.,* 417 F.2d 203, 206–08 (5th Cir.1969). *See also Walker Process Equipment,* 382 U.S. at 177, 86 S.Ct. at 350. (Just as with monopolization cases, in considering whether dangerous probability of success exists in attempt to monopolize situations, the relevant geographic and product markets must be defined in attempt to monopolize situations because a defendant's exclusionary power or ability to lessen or destroy competition can only be appraised in terms of such markets.)

The definition of the relevant market is essentially a fact question which depends heavily upon the special characteristics of the industry involved. *Sulmeyer,* 515 F.2d at 849.

Exhibits accompanying the opposition to and the motion for summary judgment include the following:

The affidavit of John Koerner, III, President of Barq's Biloxi, contends that there is a nationwide geographic market for Barq's Biloxi. He defines the relevant product market of Barq's as all soft drink products since Barq's Biloxi is in competition with all other soft drink products and a change in the price of Coca–Cola changes the root beer price. Koerner states that at the present time sales of Barq's Biloxi products represent less than one percent (1%) of the total soft drink market and it sells no product in the New Orleans and Baton Rouge areas. Therefore, Barq's Biloxi's share of the New Orleans and Baton Rouge soft drink or root beer markets is zero percent (0%).

Yula Robinson Danna (Secretary/Treasurer of Barq's Baton Rouge) in her affidavit designates the geographic area of competition for Barq's Beverages of Baton Rouge as the Baton Rouge metropolitan area including the surrounding parishes of Tangipahoa, St. Helena, Livingston, East Feliciana, West Feliciana, Pointe Coupee, Avoyelles, Iberville, West Baton Rouge, East Baton Rouge, Ascension, St. James, Assumption and part of Lafourche. Within that restricted geographic area, Ms. Danna assesses only the root beer submarket. She states that Barq's Baton Rouge market share of the root beer submarket in the Baton Rouge metropolitain area is greater than fifty percent (50%).

The affidavit of Kendall D. Elliott, II, Vice–President and General Manager of Barq's New Orleans, designates the geographic area of "effective competition" for Barq's New Orleans as the New Orleans metropolitan area including the Parishes of Orleans, Jefferson, St. Bernard, Plaquemines, St. Charles, St. John and St. Tammany. Within that area, Mr. Elliott places Barq's New Orleans' share of the soft drink market at twenty percent (20%), and Barq's New Orleans' share of the root beer submarket at approximately eighty percent (80%). He also stated in his deposition that Barq's pricing is similar to "other competitive products such as Coca-cola, 7–Up, Pepsi …"

Donald Vinson, an expert witness for Barq's Louisiana, in his affidavit defined the relevant product market for "Barq's Beverages" as root beer, not soft drinks generally. He stated that the geographic market for "Barq's Beverages root beer" was the New Orleans and Baton Rouge metropolitan areas.

The relevant geographic market is the area in which the antitrust defendant competes with others for the distribution of the relevant product. *Otter Tail Power Company,* 410 U.S. at 369, 93 S.Ct. at 1025–26. Geographically, a market is the "area of effective competition" where a buyer can practically and feasibly turn to make its purchase. *See generally United States v. Phillipsburg National Bank & Trust Co.,*

399 U.S. 350, 362, 90 S.Ct. 2035, 2042, 26 L.Ed.2d 658 (1970) (relevant geographic market under § 7 of Clayton Act "must be charted by careful selection of market area in which the seller operates and to which the purchaser can practicably turn for supplies ..." [citation omitted]). This Court found that the plaintiff and the defendants were co-owners of the trademarks at issue but in separate and distinct geographical area. Since the parties conduct business in independent trademark areas, there is no geographic "area of effective competition."

The test for defining the relevant product market as set forth by the U.S. Supreme Court involves "commodities reasonably interchangeable by consumers for the same purposes." *Dupont*, 351 U.S. at 395, 76 S.Ct. at 1007, 100 L.Ed. at 1280. Based upon the theory of interchangeability, which allows for closely related product substitutes to be considered in the relevant market, the appropriate unit here is all soft drinks.

Barq's root beer is merely one soft drink in a market of competing soft drinks. As the court stated in *Domed Stadium Hotel*, 732 F.2d at 488, "absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market."

In order to show a violation of attempted monopolization, Barq's Louisiana would have to show that the actions of Barq's Biloxi have led to or resulted in a dangerous probability that it will gain a monopoly over the product in issue. *Dimmitt Agri Industries, Inc. v. CPC International, Inc.*, 679 F.2d 516, 525 (5th Cir.1982); *Spectrofuge*, 575 F.2d at 276.

Undisputed evidence of low market share may make monopolization an impossibility as a matter of law. *Dimmitt*, 679 F.2d at 529. "[D]efendant must have some legally significant share of the market before he approaches the level of dangerous probability of success condemned by the attempt provision of Section 2 (Citations omitted)." *Domed Stadium*, 732 F.2d at 490.

Under either the soft drink or the root beer product market, Barq's Biloxi has too low a share of the product market for

monopolization or the attempt to monopolize to be possible as a matter of law. Since Barq's Biloxi does not sell its product in Louisiana, it has zero percent (0%) of either the soft drink or the root beer product market in the New Orleans and Baton Rouge metropolitan areas. In the Louisiana and national soft drink markets, Barq's Biloxi stands at less than one-half (½) of one percent (1%).

"While the exact market share percentage necessary to prove attempt to monopolize may vary under differing market conditions, absent a showing of special market conditions, a market share of less than 10%, as a matter of law, usually will not support a finding of an attempt to monopolize." (citations omitted) *Domed Stadium*, 732 F.2d at 491. If ten percent (10%) of the market is insufficient as a matter of law, certainly, the zero percent (0%) held by Barq's Biloxi in Louisiana or the less than one percent (1%) of the total soft drink market nationwide is also insufficient.

Let judgment be entered accordingly.