PRIMETIME 24 JOINT VENTURE,
Plaintiff,

v.

NATIONAL BROADCASTING COMPA-
NY, INC., ABC, Inc., CBS Inc., Fox
Broadcasting Company, National As-
sociation of Broadcasters, NBC Tele-
vision Affiliates, ABC Television Af-
filiates Association, CBS Television
Network Affiliates Association, Kpax
Communications, Inc., Benedek
Broadcasting Corporation, Defendants.

No. 97 Civ. 3951(LMM).

United States District Court,
S.D. New York.

Sept. 28, 1998.

Solomon, Zauderer, Ellerhorn, Frischer & Scharp, New York City by Louis M. Solomon, for Plaintiff.

Friedman Kaplan & Seiler, LLP, New York City by Eric Seiler, for Defendants.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

In this action, plaintiff PrimeTime 24 Joint Venture, a satellite operator supplying network television programming to satellite dish users in the United States, alleges that defendants, who include the major television networks, their affiliates, and certain television trade organizations, have engaged in concerted action to restrict the availability of network programming to direct-to-home satellite subscribers, in violation of federal and state antitrust and common law. Defendants have moved this Court for an order pursuant to Rule 12(b)(6) dismissing the Complaint for failure to state a claim upon which relief can be granted, or in the alternative, staying the action until the underlying copyright infringement litigation pending in the Southern District of Florida is resolved.

For the reasons stated below, the Court grants the defendants' motion to dismiss the Complaint in its entirety.

## I. BACKGROUND

The facts underlying the Complaint, when construed in the light most favorable to the plaintiff, are as follows.

### A. The Parties

Plaintiff PrimeTime 24 Joint Venture ("PT24") is the leading provider of network television programming to satellite dish owners in the United States. (Compl.¶ 6). PT24 is a satellite operator; it uplinks the programming of various broadcast networks and retransmits such programming either directly to consumers or to direct-to-home satellite distributors, who then sell packages of channels to satellite dish owners. (Compl.¶¶ 6, 30).

Defendants include: the major network companies, ABC, Inc. ("ABC"), CBS, Inc. ("CBS"), the National Broadcasting Company ("NBC"), and the Fox Broadcasting Company ("Fox"); the National Association of Broadcasters ("NAB"), a trade association comprising the networks and television stations affiliated with each network; several affiliates' associations; as well as several corporations which own and/or operate individu-

al stations affiliated with the major networks. (Compl. ¶¶ 13–22).

The network defendants—ABC, NBC, CBS, and Fox—both supply and distribute network television programming. (Compl. ¶ 26). They supply network programming to affiliate stations in over 100 localities and distribute their programming through "owned and operated" stations in cities throughout the United States. (*Id.*). Collectively, the defendants "own, control, or have the capability of securing the right to broadcast" the programming at issue in this case. (*Id.*).

## B. The Television Industry

Until the introduction of cable and satellite television, television programming was transmitted solely through over-the-air broadcasts. By nature, the reception of over-the-air programming may be limited by "the power of the broadcast transmitter, terrain, and various sorts of interference." (Compl. ¶ 27). Accordingly, rural and other isolated households are often unable to receive an over-the-air signal of a certain minimum strength. This geographic limitation, combined with the relatively small number of available broadcast frequencies, has limited the number of channels in a given area and kept local stations protected to a large extent from competition from distant stations. (*Id.* ¶ 27). Unlike cable and satellite television, however, broadcast television signals are available free of charge to anyone who has a television set and an antenna. Over-the-air broadcast stations and networks rely upon advertising revenues to pay for their programming. (Defs.' Mem. of Law at 4–5).

Satellite delivery differs from conventional, over-the-air television broadcasting in several respects. Satellite operators such as PT24 charge their customers a fee for the provision of programming. (Compl. ¶ 33). However, because it is not limited by geography or by the limited number of broadcast frequencies, satellite delivery enables customers to view network stations other than their own local station. (Compl. ¶¶ 27, 29). Although subscribers must pay for the satellite's imported network programming (which they would otherwise get for free over-the-air), viewers may choose to subscribe to a satellite operator in order to "time shift" programming, to see sports or other programming not available locally, or to avoid maintaining their overhead antennas. (Compl. ¶ 29; Defs.' Mem. of Law at 8).

Satellite operators such as PT24 find it crucial to their economic viability to be able to include network programs as part of the package of programming services delivered to their customers. (Compl. ¶ 31). Because of the market power of the television networks, direct-to-home satellite systems are at a competitive disadvantage if they cannot include network programming in the package of channels provided to their customers. (Compl. ¶¶ 4, 31).

Broadcast television programming, however, both local and network, is copyrighted. As a result, absent the copyright owner's permission or license, neither PT24 nor any satellite provider could legally retransmit copyrighted network programming to its satellite customers. Recognizing the inherent conflict between the intellectual property rights of the television networks and the desire to ensure the efficient, widespread delivery of programming via satellite, Congress passed the Satellite Home Viewer Act ("SHVA") in 1988 to provide for a limited, statutory compulsory license permitting satellite carriers to retransmit network programming to certain households. (*See* 17 U.S.C. § 119; Compl. ¶ 34). The purpose of the Act was to provide network programming to those isolated areas not served by a local network affiliate, while maintaining the existing national network/local affiliate distribution system by protecting the local affiliate's right to broadcast network programs within its local market. *See* H.R. Rep. 100–887(1), at 8 (1988).

## C. The SHVA

The SHVA permits the retransmission of network programming in certain limited circumstances in exchange for a statutory royalty fee paid to the copyright owners. (*See* 17 U.S.C. § 119; Compl. ¶ 34). Specifically, the SHVA provides satellite carriers such as PT24 with a limited compulsory license to retransmit network programming via satel-

lite only to "unserved households." The SHVA defines "unserved households" as those which can meet a two-part test: first, the household must be incapable of receiving an over-the-air signal of "Grade B intensity" (as defined by the FCC); second, the household must not have received a signal of the relevant network by cable within the 90 days before the satellite carrier initiated service to that household. (17 U.S.C. § 119(d)(10); Compl. ¶ 36). Accordingly, under the SHVA, PT24 must pay a statutorily-determined royalty fee to the networks in exchange for a statutory license to retransmit network television programming to satellite subscribers in "unserved households" as defined by the SHVA. (Compl.¶ 34).[1]

In addition to creating this limited compulsory license, the SHVA sets forth a system of ensuring compliance with and enforcement of its terms. For example, the SHVA requires satellite carriers such as PT24 to provide each network with a list of new subscribers each month in order to enable the networks and local stations to evaluate the subscribers' eligibility. (See 17 U.S.C. § 119(a)(2)). The Act also provides for a system by which the network stations may challenge a satellite carrier's transmission to a household that is believed to fall outside the statutory definition of "unserved household." When such a challenge is made, the SHVA requires the satellite carrier either to terminate service to that household within thirty days of the challenge, or to conduct a measurement of the signal intensity of the household to determine whether it is in fact "unserved." (See 17 U.S.C. § 119(a)(8)). If, after the signal strength has been tested, the household is determined not to be "unserved," the satellite carrier must terminate service within sixty days. Alternatively, if the household is found to be unserved, the challenging station must reimburse the carrier for the costs of the signal measurement. (See 17 U.S.C. § (a)(8)). In its Complaint, PT24 alleges that defendants abused this challenge system as part of a concerted effort to increase PT24's costs and ultimately to eliminate it from competition.

## D. The Complaint

PT24's Complaint alleges that, sometime in 1994 and continuing to the present, defendants conspired to restrain competition from the direct-to-home satellite industry and to limit the ability of satellite operators to make network programming available to their customers. (Compl.¶ 37). As part of this alleged conspiracy, PT24 claims that the networks, their affiliates, and certain television trade associations undertook joint action to obstruct PT24 from utilizing its compulsory license and to increase PT24's costs of complying with and exercising its rights under the SHVA. (*Id.*). According to the Complaint, this was accomplished in two major respects.

First, PT24 alleges that the defendants engaged "in a joint campaign ... to submit simultaneous and voluminous challenges to the eligibility of PrimeTime 24's subscribers under SHVA, without regard to whether the challenges had merit.... in order to overwhelm PrimeTime 24 and make it difficult and expensive for [it] to comply with SHVA." (Compl.¶ 41). PT24 alleges that the networks, the NAB, and the affiliate associations directed, encouraged, and coordinated these "excessive, simultaneous" challenges by means of mass mailings and meetings encouraging the affiliate stations to challenge PT24 subscribers aggressively, "without regard to accuracy or merit." (Compl.¶ 43). PT24 offers several facts as evidence of this conspiracy. First, PT24 claims that defendants' circulated and used a form letter, identical even as to grammatical errors, to assert their challenges. (*Id.*). Second, it claims that the network defendants all used one subscriber list—the one provided by PT24 to NBC—rather than each defendant using the individual list provided to it, which resulted in challenges by ABC, CBS, and Fox to thousands of subscribers who did not even receive their programming. (*Id.* ¶ 44). These "knowingly baseless challenges," PT24 alleges, were part of the defendants' intentional plan to drive up PT24's costs of compli-

---

1. PT24 also has an agreement with Fox's wholly-owned subsidiaries, Fox–Net, Inc. and Fox Television Stations, Inc., pursuant to which PT24 pays a fee in exchange for a license to distribute Fox Network programming to its customers in unserved households. (Compl.¶ 35).

ance with the SHVA. (*Id.*). In addition, PT24 alleges that the defendants agreed to and did challenge subscribers whom they knew could not receive an "acceptable" over-the-air signal, or who were not even within the station's predicted grade B contour. (*Id.* ¶ 45). Finally, it claims that the defendants failed to give PT24 information—specifically, a list of zip codes—sufficient to determine which of the challenged subscribers did not live within the station's predicted grade B contour. (*Id.* ¶ 47). As a result of this concerted action and the costs it imposed on PT24, PT24 alleges that it was forced to expend millions of dollars to respond to these challenges or to terminate service to the challenged households. (*Id.* ¶¶ 45–46).

As the second basis for its claims, PT24 alleges that the defendants engaged in a "group boycott" or concerted refusal to deal with PT24 in an effort further to limit competition from direct-to-home satellite operators. (*Id.* ¶ 50). In October 1996, PT24 claims to have entered into negotiations with the NAB, which was representing NBC, CBS, ABC and their affiliates. (*Id.* ¶ 50). PT24 alleges that it offered to compensate the local affiliates for potential advertising revenue they claimed to have lost due to PT24 subscribers in the local area of each station. (*Id.* ¶ 50). After PT24 agreed to negotiate on the terms suggested by the NAB, the NAB representative allegedly refused to negotiate further. (*Id.* ¶ 50). PT24 then sought to deal with each network station directly. In or about February 1997, PT24 sent letters to each of the approximately 600 stations affiliated with, owned or operated by ABC, CBS and NBC, offering to pay each a monthly fee for subscribers in the station's local area. (*Id.* ¶ 51). According to PT24, the defendants then organized a concerted campaign "to ensure that no affiliate would break ranks and enter into discussions with PrimeTime 24." (*Id.* ¶ 52). As part of this alleged campaign, the NAB sent a letter to PT24, copied to all of its members, signaling the stations not to negotiate with PT24. (*Id.*). PT24 alleges that the networks also discouraged their affiliates

from dealing with PT24. (*Id.* ¶ 53). Finally, PT24 claims that in or about February 1997, it also wrote to NBC, ABC, and CBS directly, making separate offers to pay each network a license fee to distribute its programming to satellite subscribers.[2] According to PT24, pursuant to their conspiracy, none of the networks have been willing to negotiate with PT24. (*Id.* ¶ 54).

PT24 alleges that as a result of the defendants' conduct, it has been injured in its business and property, specifically by having lost profits, incurred unnecessary expenses, and having been weakened and "threatened with elimination as a competitive force in the industry." (*Id.* ¶ 55). It also claims that competition has been adversely affected. (*Id.* ¶ 56). Specifically, PT24 asserts that defendants' conduct has stifled competition in "any and all relevant markets and sub-markets" by "depriving consumers of the ability to choose between the traditional manner of receiving television programming and the technologically superior direct-to-home satellite systems." (*Id.* ¶ 56). PT24 claims that defendants, by limiting the use of satellite for "multiple channel television systems," have insulated themselves from the competition that would result from the availability of direct-to-home satellite packages including hundreds of channels. (*Id.*).

Meanwhile, beginning in or about March 1996, various lawsuits were being filed nationwide against PT24 by the networks and their affiliates charging PT24 with copyright infringement for its unauthorized retransmission of network programs to ineligible households. (*See* Defs.' Mem. of Law, at 10 n. 8). In one of these actions, the United States District Court for the Southern District of Florida recently granted a preliminary injunction against PT24.[3]

PT24 filed its Complaint with this Court on May 30, 1997 seeking injunctive and compensatory relief for the defendants' alleged anti-competitive conduct. Counts I and II of the Complaint allege violations of Section 1 of the Sherman Act. Count III alleges that

---

2. PT24 also wrote to Fox, seeking to amend their agreement to eliminate the "unserved household" limitation in exchange for a fee.

3. *See* 5/12/98 Order in *CBS Inc. v. PrimeTime 24 Joint Venture,* 96–3650–Civ–Nesbitt.

defendants restrained trade in violation of New York's Donnelly Act. Count IV charges defendants with interference with contractual relations, and Count V alleges interference with business relations. Count VI alleges that defendants engaged in unfair competition and deceptive acts and practices.

Defendants have moved this Court for an order dismissing the Complaint and/or staying the action. In support of their Motion to Dismiss, defendants argue that their conduct is protected petitioning activity immune from antitrust liability under the *Noerr–Pennington* doctrine. In the alternative, they assert that PT24 has failed adequately to allege adverse effect on competition as is required in order to state a claim under the Sherman Act, and that in any event, PT24 lacks standing to sue because it has not suffered antitrust injury.

## II. DISCUSSION

### A. Legal Standard

■ Defendants have moved to dismiss the Complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. "An antitrust complaint must 'adequately' ... define the relevant product market, ... allege antitrust injury, [and] ... allege conduct in violation of the antitrust laws." *International Audiotext Network v. American Telephone & Telegraph Co.,* 893 F.Supp. 1207, 1211 (S.D.N.Y.1994) (quoting *Re–Alco Indus., Inc. v. National Ctr. for Health Educ., Inc.,* 812 F.Supp. 387, 391 (S.D.N.Y.1993)), *aff'd,* 62 F.3d 69 (2d Cir. 1995). The standard governing a motion to dismiss an antitrust complaint is the same as in other types of cases. *Minnesota Mining & Mfg. Co. v. Graham–Field, Inc.,* 1997 WL 166497, *3 (S.D.N.Y. April 9, 1997); *Philip Morris Inc. v. Heinrich,* 1996 WL 363156, *7, 1996 U.S. Dist. LEXIS 9156, *39–41 (S.D.N.Y. June 25, 1996). In considering such a motion, the Court must read the complaint generously, accepting the truth of, and drawing all reasonable inferences from, the well-pleaded factual allegations. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). In determining the sufficiency of the com-

plaint, a court may consider, in addition to the factual allegations on the face of the complaint, documents attached to it as exhibits or incorporated by reference, matters of which judicial notice may be taken, and documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing suit. *Brass,* 987 F.2d at 150. The Court will not dismiss a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### B. The Sherman Act Claims

■ Section One of the Sherman Act declares unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1 (1997). In order to state a claim for a violation of § 1 of the Sherman Act, a plaintiff must allege (1) concerted action by two or more persons, (2) that unreasonably restrains interstate or foreign trade or commerce. *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.,* 996 F.2d 537, 542 (2d Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993); *International Audiotext,* 893 F.Supp. at 1222. However, even where a plaintiff has adequately pled both elements of a § 1 claim, his complaint may nevertheless be dismissed for failure to state a claim where the defendants' alleged anticompetitive actions qualify as petitioning conduct immune from antitrust liability under the *Noerr–Pennington* doctrine. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 135–36, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Moreover, *Noerr–Pennington* protection is not an affirmative defense; rather, the antitrust plaintiff "has the burden of establishing that the defendant restrained trade unreasonably, which cannot be done when the restraining action is that of the government." 1 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 207c (rev. ed.1997). Accordingly, in order to survive a motion to dismiss, PT24 must allege facts showing that

*Noerr–Pennington* immunity does not attach to the defendants' actions.

## 1. Noerr–Pennington Immunity

■ In *Noerr*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Supreme Court established the basic principle of antitrust immunity for petitioning conduct, holding that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Pennington*, 381 U.S. at 670, 85 S.Ct. 1585. Although the *Noerr–Pennington* doctrine, which derives in part from First Amendment principles, originally was created to immunize efforts to influence legislative or administrative officials, it now extends to insulate attempts to persuade adjudicative bodies as well. *See California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Miracle Mile Assocs., v. City of Rochester*, 617 F.2d 18, 20 (2d Cir.1980). Accordingly, under the *Noerr* doctrine, parties may engage in joint efforts to utilize the courts to protect their economic interests without violating the antitrust laws, so long as their efforts do not amount to a "mere sham." *See California Motor Transport*, 404 U.S. at 510–11, 92 S.Ct. 609; *Miracle Mile*, 617 F.2d at 21. Specifically, good faith efforts to enforce a valid copyright have been held to be protected conduct that does not violate the antitrust laws. *See Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 161 (3d Cir.1984); *W. Goebel Porzellanfabrik v. Action Indus., Inc.*, 589 F.Supp. 763, 767 (S.D.N.Y.1984).

Defendants argue that both forms of conduct challenged by PT24 as violating the antitrust laws—their simultaneous submission of "baseless, meritless" challenges under the SHVA and their alleged "group boycott" of PT24—are protected by the *Noerr–Pennington* doctrine.

### (a) *Defendants' SHVA challenges*

PT24 asserts that defendants' concerted SHVA challenges were not incident to any attempt to influence a government official and therefore do not qualify as petitioning conduct protected under the *Noerr* doctrine. The Court disagrees.

Good faith litigation clearly falls within the parameters of the *Noerr* doctrine. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 58–60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993); 1 Areeda & Hovenkamp § 202 (" 'Litigation' has a Noerr immunity ... that cannot be taken away, no matter what the claimant's motive, 'unless it is objectively baseless.' ") (quoting *Professional Real Estate*, 508 U.S. at 60, 113 S.Ct. 1920). Given that fact, courts and commentators consistently have recognized that conduct or communication which is incident to or attendant upon effective litigation should also receive *Noerr* immunity. *See, e.g., McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1560 (11th Cir. 1992) (finding that "concerted threats of litigation, no less than the actual initiation of litigation, do not violate the Sherman Act"); *Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358, 1366 (5th Cir.1983) ("Given that petitioning immunity protects joint litigation, it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation. The litigator should not be protected only when he strikes without warning. If litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute."); *Matsushita Electronics Corp. v. Loral Corp.*, 974 F.Supp. 345, 359 (S.D.N.Y.1997) (acts incidental to protected litigation, such as letters threatening court action, are entitled to immunity); *Thermos Co. v. Igloo Products, Corp.*, 1995 WL 842002, *3 (N.D.Ill. Sept.27, 1995)("The Noerr–Pennington doctrine yields antitrust immunity to those who would protect their legal rights (i.e. trademark registrations) and includes prelitigation rights"); *Barq's Inc. v. Barq's Beverages, Inc.*, 677 F.Supp. 449, 452 (E.D.La.1987) (where trademark litigation was initiated in good faith, plaintiff's actions which preceded it—includ-

ing demand letters—were also immune from antitrust liability under *Noerr*); 1 Areeda & Hovenkamp § 205(e) ("It would be anomalous and socially counterproductive to protect the right to sue but not the right to threaten a lawsuit."). Because pre-litigation communications provide useful notice of potential liability and facilitate the settlement of controversies, "[i]t would be foolish to adopt antitrust rules encouraging suit before communication by penalizing the communication but not the suit." 1 Areeda & Hovenkamp § 205(e).

■ While no court has yet addressed the specific conduct at issue in this case—namely, the submission of concerted challenges pursuant to the SHVA—courts have found analogous conduct, such as the sending of trademark policing letters and demand letters, to be related to litigation and therefore subject to *Noerr* immunity. *See, e.g., Matsushita*, 974 F.Supp. at 359 (patent holder's letters to potential infringers warning them of possible infringement were protected under *Noerr*); *Thermos*, 1995 WL 842002, at *3 (*Noerr* doctrine protects prelitigation rights such as the sending of trademark policing letters to alleged infringers); *Barq's*, 677 F.Supp. at 452–53 (finding that defendants' writing of demand letters preceding trademark infringement lawsuit was protected activity under *Noerr*). Moreover, the case for immunity is particularly strong in this context, considering that the challenged conduct was engaged in as part of a statutory system of monitoring and enforcing defendants' rights under the Copyright Act. In the SHVA, Congress created the challenge provisions as a means of resolving disputes between copyright owners and satellite carriers and of ensuring that the intellectual property rights of the former are not violated by the transmission of copyrighted programs to ineligible households. Considering the expense and burden that would result from monitoring the eligibility of satellite subscribers, Congress recognized the necessity of implementing a system of voluntary cooperation and self policing in order efficiently to carry out the policy and terms of the SHVA. *See* H.R.Rep. No. 100–887(1), at 19 (1988). Further, the legislative history of the SHVA indicates that the challenge system was designed as a means to encourage cooperative enforcement of the Act's terms in order to avoid litigation, if possible. *See id.* ("The Committee expects the interested parties, in good faith, to investigate and mutually discuss the correction of instances in which ineligible subscribers are being served before resorting to litigation."). It would be particularly anomalous to deny immunity to defendants' conduct because it was independent of or unnecessary to litigation where Congress envisioned such conduct as a means of resolving disputes without litigation.

Accordingly, it is immaterial that defendants' challenges came more than two years before the commencement of the infringement litigation in Florida; the challenges themselves would be entitled to protection even if no litigation were ever filed, provided they were good faith efforts to enforce defendants' valid copyrights pursuant to the SHVA. *See Matsushita*, 974 F.Supp. at 359 (finding letters sent by patent holder to possible infringers to be protected as "reasonably attendant upon effective litigation," even though no law suit was ever filed against them). PT24's attempt to distinguish defendants' challenges from the demand and cease and desist letters found by other courts to be protected under *Noerr* is similarly unavailing. PT24 argues that the SHVA challenges are different from such conduct in that the challenges are not a warning of litigation because they are not required before litigation is commenced. However, this fact is irrelevant because the challenges remain part of a system created by Congress to resolve disputes between copyright owners and alleged infringers. As such, they serve the same function and invoke the same policies that underlie *Noerr*'s protection of litigation and conduct incident to it.

The Court therefore concludes that the defendants' concerted SHVA challenges constitute petitioning activity that cannot be a basis of antitrust liability under the *Noerr* doctrine.

#### (b) *Defendants' Refusal to Negotiate*

■ PT24 also argues that defendants engaged in a group boycott of PT24 that "nei-

ther involve[d] nor [was] incident to petitioning a government official or a court to take any action, so it cannot be protected by the *Noerr* doctrine." (Pl.'s Mem. of Law at 13). Defendants maintain that their decision not to negotiate with or grant licenses to PT24 amounted to the rejection of a settlement offer, which constitutes protected petitioning activity. The Court agrees with defendants.

Defendants were under no obligation to negotiate with or grant a license to PT24 to enable it to retransmit copyrighted network programming. In fact, the only way PT24 may legally retransmit network programming to satellite subscribers, absent the copyright holder's permission, is pursuant to the limited compulsory license provided to it under the SHVA. *See* H.R.Rep. No. 100–887(1), at 27 (1988) ("Unless the statutory license of section 119 is obtained ... the secondary transmission by a satellite carrier for private home viewing can take place only with the consent of the copyright owner."). Any transmission of network programming to ineligible households would constitute a violation of the SHVA unless PT24 obtained permission from the networks or their affiliates or proved that the household was in fact "unserved" as defined in the SHVA. *See* H.R.Rep. No. 103–783, 1994 WL 454551, at *11 (clarifying that under SHVA, burden of proof is on satellite carrier to show, as an affirmative defense to infringement claim, that household is "unserved"). Accordingly, PT24's offers to "negotiate" with defendants, through which it sought to pay the defendants a fee in exchange for the right to retransmit network programming to served (ineligible) households, were attempts to avoid liability for infringing defendants' copyrights. Defendants' concerted refusal to accept these offers therefore amounted to the rejection of a settlement offer. As such, the refusals cannot be a basis for antitrust liability. *See Columbia Pictures, Industries, Inc., v. Professional Real Estate Investors, Inc.,* 944 F.2d 1525, 1528 (9th Cir.1991), *aff'd,* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ("[Plaintiff's] request for licensing amounted to an offer to settle the lawsuit. ... A decision to accept or reject an offer of settlement is conduct incidental to the prosecution of the suit and not a separate and distinct basis for antitrust liability."). As discussed below, PT24's allegations only serve to support this conclusion.

First, PT24 claims that in or about October 1996, it approached the NAB with an offer to compensate the local affiliates for lost advertising revenue caused by PT24 subscribers in the local area of each station. (Compl.¶ 50). Although the NAB initially quoted a fee of $2.00 per subscriber, it subsequently withdrew its offer and declined to negotiate further. (*Id.*). PT24's second attempt to deal with defendants came in February 1997—notably, after a least one infringement lawsuit had been filed against it—when PT24 wrote to each affiliate station individually and offered to pay it a fee for subscribers in the station's local area. (Compl.¶ 51). According to PT24, the affiliates were encouraged to and did refuse to negotiate pursuant to a campaign initiated by the NAB and effectuated by the networks. (Id.¶¶ 52–53). Finally, PT24 alleges that its February 1997 offers to the networks themselves were similarly rejected pursuant to a conspiracy among defendants. (Id.¶ 54). None of these allegations shows the defendants' conduct to be anything more than a joint decision to exercise their rights by declining to accept PT24's offer to compromise. Nor does the fact that defendants may have acted as a group in deciding not to accept PT24's offers render their conduct unlawful. *See Columbia Pictures,* 944 F.2d at 1528–29 (group of eight movie studios' concerted refusal to grant plaintiff a copyright license amounted to rejection of plaintiff's settlement offer and therefore was protected activity under *Noerr* ). In fact, such joint activity apparently was contemplated by Congress in drafting the SHVA. *See, e.g.,* H.R.Rep. No. 100–887, at 22–23 (1988) ("The joint activity among copyright owners and satellite distributors and carriers to designate common agents and to negotiate would generally promote competition.").

Furthermore, PT24's attempt to distinguish *Columbia Pictures* is unavailing. PT24 points out that the refusal to negotiate in that case came *after* the filing of infringement litigation and therefore could more aptly be described as the rejection of a settle-

ment offer, while in this case, PT24's offers were made before litigation was filed. However, in this case as in *Columbia Pictures*, the defendants' conduct should receive *Noerr* immunity because if the defendants had accepted PT24's offer and agreed to license it, any infringement dispute would be moot. *See Columbia Pictures*, 944 F.2d at 1528. It is immaterial that at the time of PT24's October 1996 offer, no litigation had yet been filed.[4] Defendants had challenged PT24's transmission of copyrighted programming to ineligible subscribers through the means established by the SHVA, thereby notifying PT24 of its possible infringement of defendants' copyrights; PT24's offers to compensate defendants for lost revenue therefore constituted, in effect, settlement offers. Accordingly, the defendants' rejections of those offers, which PT24 styles a "group boycott," cannot be the basis for antitrust liability under *Noerr*.

### (c) *The Sham Exception*

■ Nor has PT24 adequately pleaded facts alleging that defendants' conduct falls within the sham exception to *Noerr–Pennington* immunity.

■ In *Noerr* and subsequent decisions, the Supreme Court explained that petitioning conduct otherwise immune under the *Noerr* doctrine may be the basis for antitrust liability where the petitioning amounts to a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *California Motor Transport*, 404 U.S. at 511, 92 S.Ct. 609 (quoting *Noerr*, 365 U.S. at 144, 81 S.Ct. 523). The Court has since set forth a two-part test to determine when petitioning conduct in the form of litigation amounts to a sham. First, such conduct must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Professional Real Estate Investors*, 508 U.S. at 60, 113 S.Ct. 1920. Then, only if the challenged litigation is "objectively meritless" may a court proceed to the second step of examining the litigant's subjective motivation to determine "whether the base-

less lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *Professional Real Estate*, 508 U.S. at 60–61, 113 S.Ct. 1920 (quotations omitted). Where the challenged anticompetitive conduct consists of repeated, allegedly baseless suits, the proper inquiry is "whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.... Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?" *USS–POSCO Industries v. Contra Costa County Bldg. & Const. Trades Council*, 31 F.3d 800, 811 (9th Cir.1994); *see also California Motor Transp.*, 404 U.S. at 512–13, 92 S.Ct. 609 (concluding that plaintiff must establish a pattern of baseless, repetitive claims).

Although PT24 has not alleged that the infringement suits filed by some of the defendants were themselves part of defendants' antitrust conspiracy, a similar test governs whether the pre-suit SHVA challenges constituted sham petitioning. *See* 1 Areeda & Hovenkamp § 205(e) (reasoning that the sham exception should also apply to threats to sue and other pre-suit communications, leaving threats to sue that are "actually or reasonably known by the antitrust defendant to be baseless" unprotected under the sham exception); *see also CVD v. Raytheon Co.*, 769 F.2d 842, 850–51 (1st Cir.1985) (holding that antitrust plaintiff must show by clear and convincing evidence that claims of threatened trade secret suit were asserted while known to be false), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986). Accordingly, PT24 must allege that the defendants' concerted SHVA challenges and related conduct were objectively baseless, which it has not done.

As an initial matter, the ultimate success of defendants' motion for a preliminary injunction against PT24 in the Florida infringement

---

**4.** As noted above, at the time of PT24's second attempt to negotiate, in February 1997, at least one law suit had been filed against it. *See* Defs.' Mem. Of Law at 10 n. 8.

litigation, while not alone determinative of the merit of their pre-suit challenges, does help to refute any claim of baselessness. *See, e.g., Music Center S.N.C. v. Prestini Musical Instruments Corp.*, 874 F.Supp. 543, 551 (E.D.N.Y.1995) (finding it impossible to hold defendant's petition objectively baseless where agency found that complaint merited investigation).

Moreover, the facts alleged by PT24 in support of its invocation of the sham exception do not satisfy its burden of showing that defendants' conduct is not entitled to *Noerr* immunity. PT24's Complaint alleges that defendants submitted "simultaneous and voluminous challenges to the eligibility of [PT24's] subscribers under SHVA, without regard to whether the challenges had merit." (Compl.¶ 41). However, the facts offered as showing lack of merit are insufficient to plead adequately a sham. PT24 alleges that the defendants' use of a single subscriber list resulted in a "substantial error rate" and is evidence of the baselessness of their challenges. (Compl.¶ 44). It fails to allege, however, that the use of the NBC list was unreasonable under the circumstances or that defendants knew that challenges based on this list would be meritless. Absent such an allegation, this fact does not make out a claim of baselessness. PT24 also points out that defendants challenged all or most of PT24's subscribers within the predicted grade B contour, even though they knew that many of these subscribers were incapable of receiving an "acceptable" over-the-air signal. (Compl.¶ 45). As a matter of law, such an allegation does not make out a claim of baselessness because the SHVA does not determine eligibility based on the subjective "acceptability" of signals, but rather on an objective determination of whether the household receives a signal of "grade B intensity" or higher. *See* 17 U.S.C. § 119(d)(10). Accordingly, submitting challenges to subscribers within the predicted grade B contour was objectively reasonable. Finally, PT24 alleges that "many affiliates" submitted challenges even to subscribers not located within the station's predicted grade B contour. (Compl.¶ 45). While PT24 is correct that in such a case, the station itself is to conduct any testing of signal strength, the fact that the SHVA includes specific provisions governing the procedure for challenging households located outside the predicted grade B contour shows that Congress recognized that these households might nevertheless be receiving a grade B signal and therefore be ineligible for satellite delivery. As a result, this allegation also fails to state that defendants actually knew or reasonably should have known such challenges to be baseless. In any event, PT24's assertion that "many" challenges were in error would be insufficient to plead sham petitioning as a matter of law. *See USS–POSCO*, 31 F.3d at 811 (allegations in complaint did not show that conduct fell within sham exception where more than half of defendants' filings alleged to have been filed "without regard to the merits" proved successful).

Therefore, because PT24 has not alleged facts sufficient to plead the applicability of the sham exception, defendants' conduct remains immune from antitrust liability under the *Noerr–Pennington* doctrine and plaintiff's Sherman Act claims must be dismissed.[5]

## C. The State Law Claims

Counts III through VI of the Complaint assert state law claims against defendants for violations of New York's Donnelly Act, interference with contractual and business relations, and unfair competition. Plaintiff has failed to allege a violation of federal antitrust law, the sole basis for this Court's federal question jurisdiction. As there is no diversity among the parties, the Court dismisses the remaining state law claims for lack of jurisdiction. *See Lennon v. Miller*, 66 F.3d 416, 426 (2d Cir.1995) (having dismissed plaintiff's underlying federal claims before trial, court should dismiss state claims as well for lack of jurisdiction).

## CONCLUSION

The Court therefore grants defendants' motion to dismiss the Complaint in its entire-

---

**5.** Because the Court finds defendants' conduct to be immune from antitrust liability under the *Noerr* doctrine, it does not address defendants' further arguments that plaintiff has failed adequately to plead adverse effect on competition or antitrust injury.

ty, and the Clerk is directed to enter judgment accordingly.

SO ORDERED.